589 A.2d 958

**Michael Edward CONNELLY**

v.

**STATE of Maryland.**

**No. 69, Sept. Term, 1990.**

Court of Appeals of Maryland.

May 13, 1991.

Thomas Bernier (Russell J. White, White & Karceski, all on brief), Towson, for petitioner/cross respondent.

Gary E. Bair, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Jillyn K. Schulze, Asst. Atty. Gen., all on brief), Baltimore, for respondent/cross petitioner.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE and CHASANOW, JJ., CHARLES E. ORTH, Jr., Judge of the Court of Appeals (retired), Specially Assigned and LLOYD L. SIMPKINS, Judge of the First Judicial Circuit of Md. (retired), Specially Assigned.

MURPHY, Chief Judge.

This case focuses upon the good faith exception to the exclusionary rule first articulated in *United States v. Leon,*

468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); that case holds that the Fourth Amendment exclusionary rule does not preclude the use of evidence obtained by officers acting in objectively reasonable, good faith reliance on a facially valid search warrant issued by a detached and neutral magistrate but later determined to be unsupported by probable cause. The question before us is whether, under *Leon*, evidence of illegal lottery and gambling activities seized pursuant to a search warrant, which the State now concedes was not issued upon probable cause, was nevertheless admissible at trial under the good faith exception.

## I.

The application for the warrant (with the accompanying affidavit) was submitted by Detectives James Duffey and Gary Pfaff of the Baltimore County Police Department on November 17, 1988. The affiant officers represented that probable cause existed to believe that the laws relating to illegal lottery and gambling, Maryland Code (1957, 1987 Repl.Vol.), Art. 27, §§ 356 through 363, were being violated by Michael Connelly and James Edenton at Connelly's residence and place of business, a video rental store, both of which were located at specified addresses in Essex, Maryland.

After stating the law enforcement experience of each affiant, the application described, in considerable detail, the methodology by which an illegal lottery operation is conducted; that it is "managed in echelons of authority increasing up the ladder with an increasing responsibility of money and work or action held"; that most of the persons involved in these activities were "writers or runners" who make the "street contacts" and accept bets for cash on any three-digit number; that the writer passes "the action collected for the day on to someone up the ladder before a predetermined time or his action will not be accepted"; that the writer may not pass the money collected "up the line" on a daily basis as winning numbers "may be paid by a runner to his

customers from a bankroll which is tallied up weekly"; and that, with respect to the three-digit number selection, a wager can be placed "on the outcome of the Maryland State Lottery number or the street number which is derived by the pari-mutuels at a specified horse track."

The affiants next set forth further intricate details of these illegal activities, which involved other persons known as clerks; that clerks tally the amount of money played on the various numbers, and have authority to "lay off" wagers to other organizations; that clerks pass their "work" to the "bank," which keeps a tally sheet on all street runners; and that the bank is in contact with the "backer," who has no contact with the runners, but provides "money for bail or legal counsel to the lower echelon people." The application states that the affiant Duffey knows that the illegal lottery number is based on the State lottery number, which is drawn at 7:30 p.m.

The affiants stated in the application that "[i]n February, 1988," a confidential informant advised that Connelly and Edenton "were conducting illegal gambling activities and were meeting in Connelly's video store ... in the evenings." As a result of this information, the affiants said that "surveillance was conducted on numerous occasions at Connelly's store"; that at approximately 7:25 p.m. on the days "surveilled," Edenton would enter Connelly's store and talk with him; that the two men looked at "sheets of paper"; that on one such occasion, Connelly produced the papers from his coat pocket while, on other occasions, Edenton produced the papers from his pocket and showed them to Connelly; that at 7:35 p.m., Edenton would leave the store but "at no time" did he ever rent or purchase a video tape.

According to further sworn averments in the application, surveillance was conducted on Edenton "Monday through Friday, from 4 p.m. to 7:30 p.m., over several months"; that it disclosed that at 4:30 p.m., Edenton would leave his residence and drive, in a designated order, to a number of different taverns, bars, and garages, stopping only briefly at each; that at one bar, Detective Duffey observed a man

ask Edenton for his "winnings," after which Edenton paid the man "from a roll of money in his pocket."

Next, the application outlined that at approximately 6:30 p.m., one Gerald Taylor, a bookmaker with an arrest record, would enter Edenton's residence carrying small pieces of paper; that at 6:40 p.m., one Betty Farmer would enter Edenton's residence, remaining for 20–30 minutes, after which Edenton would drive to the residence of one Larry Short, who also was previously arrested for bookmaking; and that upon leaving this location, Edenton would go to Connelly's video store, arriving before 7:30 p.m. The affiants recited that

"Edenton's daily activities are characteristic of a bookmaker collecting bets and making payoffs during those times consistent with illegal gambling activities. Betty Farmer and Gerald Taylor's daily arrivals at Edenton's house are characteristic of runners in a bookmaking operation. On every occasion Edenton was surveilled driving to Essex, he always arrived at Connelly's residence or video store *prior* to the Maryland State Lottery number being drawn. Your affiant, Detective Duffey, feels Edenton reports to and works for Michael Connelly, furthering an illegal gambling scheme." (Emphasis in original.)

Finally, the affiants set forth Edenton and Connelly's prior conviction records for bookmaking and gambling, which were known to affiants at the time of their surveillance.

The warrant was executed by the affiants on November 28, 1988, eleven days after its issuance. Incriminating evidence of illegal lottery and gambling was found in Connelly's residence and video store, and he was subsequently charged with multiple violations of the State's lottery and gambling laws.

Prior to trial in the Circuit Court for Baltimore County, Connelly moved to suppress the evidence; he claimed that there was no probable cause to support the issuance of the

warrant. He argued that although the affidavit and application for the search warrant was made in November, 1988, it was based on surveillance conducted in February, 1988. He further argued that the "times" and "numerous occasions" described in the affidavit were not specific as to dates and thus could have been in March, April or May, months before the application for the warrant was made. Connelly argued that in these circumstances, the State's reliance on *Leon's* good faith exception to the exclusionary rule was inappropriate. Not to include the dates when the observations were made, according to Connelly's argument, misled the court and prevented him from "disputing anything that is in the warrant." Connelly made clear that he was not accusing the affiants of perjury, but remarked that the warrant application was "skillfully drawn ... to evade any specificity whatsoever."

In denying the motion to suppress, the court (Buchanan, J.) said:

"It's not a question ... whether or not I would have signed [the warrant]. The question is that under *Leon*, they go to the magistrate, they get a warrant based on information that really was stale or lacked probable cause, and the magistrate signed it. The magistrate is the one that made the mistake. The exclusionary rule is designed to deter the misconduct of the police rather than punish the errors of the judicial magistrate. I think the good faith exception applies."

Following convictions for possessing lottery tickets, keeping a place for the sale of lottery tickets, and two counts of gambling on a sporting event, Connelly appealed. He again contended that the warrant was invalid and that nothing in *Leon* permitted the incriminating evidence to be introduced at his trial.

The Court of Special Appeals, in an opinion by Judge Rosalyn Bell, determined that the affidavit was not sufficiently specific to support a finding of probable cause and that it was stale. *Connelly v. State,* 82 Md.App. 358, 571 A.2d 881 (1990). It said that nothing in the affidavit indi-

cated that the individuals under surveillance were engaged in a continuing enterprise, and that there was a considerable probability that their activities, "given the time lag, were no longer being continued." 82 Md.App. at 364. Moreover, the court agreed with Connelly that because of the vagueness of the warrant application, as to the specific dates of surveillance, he could not attack the warrant's validity in the trial court under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), to establish that a material omission was made in the affidavit, either intentionally or with reckless disregard for the truth, or show that Connelly was incorrectly identified as the person under surveillance.

As to staleness, the intermediate appellate court, relying upon *Peterson v. State*, 281 Md. 309, 314, 379 A.2d 164 (1977), *cert. denied.* 435 U.S. 945, 98 S.Ct. 1528, 55 L.Ed.2d 542 (1978), concluded that because the affidavit supporting the warrant was executed so many months after the time of the affiants' investigatory observations, probable cause was lacking for that reason.

As to *Leon*, the court held that the trial judge was patently wrong in his determination that that case required, once a magistrate signed the warrant, that there could be no further review of the conduct of the police officers in executing the warrant. The court said that it could not reach a conclusion on the good faith issue because it involved a question of fact which the trial court did not resolve—namely, whether the police officers could have harbored a reasonably objective belief in the existence of probable cause, as set forth in the application for the warrant. If they could, the court said, and the good faith exception was therefore applicable, then the search, "despite the lack of specificity and staleness in the warrant, would be valid and the items obtained from the search were properly admitted into court." 82 Md.App. at 366, 571 A.2d 881. Accordingly, the intermediate appellate court, by its mandate, remanded the case to the trial court "for the purpose of conducting a suppression hearing on the avail-

ability of the good faith exception." *Id.* at 369, 571 A.2d 881. If, on remand, the State is found to be entitled to the exception under *Leon,* the court said that the convictions would stand; if not, the motion to suppress should be granted and Connelly afforded a new trial.

We granted certiorari to consider the significant issue of public importance involved in the case.

## II.

As stated by the Supreme Court in *Franks v. Delaware, supra,* 438 U.S. at 164, 98 S.Ct. at 2680, the bulwark of the Fourth Amendment protection is the Warrant Clause, which requires, absent certain exceptions, that the police obtain a search warrant, based upon a showing of probable cause, before embarking upon a search. In that case, the question before the Court was whether, after a search warrant had been issued, the defendant had a right "to challenge the truthfulness of factual statements made in an affidavit supporting the warrant." *Id.* at 155, 98 S.Ct. at 2676. In concluding that there was such a right, the Court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Id.* at 155–56, 98 S.Ct. at 2676. The Court indicated that if the defendant proves at that hearing, by a preponderance of the evidence, "with the affidavit's false material set to one side, [that] the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided." *Id.*

Because the Fourth Amendment demands a factual showing sufficient to comprise probable cause, the Court said that the showing must be truthful "in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Id.* at 164–65, 98 S.Ct. at 2681. As

to this, the Court stated "that a warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter." *Id.* at 165, 98 S.Ct. at 2681. It would be an unthinkable imposition upon the authority of the magistrate, the Court said, "if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment." *Id.* The Court declined to extend the rule, however, "beyond instances of deliberate misstatements, and those of reckless disregard," noting that the magistrate is otherwise the sole protection of a citizen's Fourth Amendment rights "where police have been merely negligent in checking or recording the facts relevant to a probable-cause determination." *Id.* at 170, 98 S.Ct. at 2683.

The Court concluded in *Franks* that there is "a presumption of validity with respect to the affidavit supporting the search warrant." *Id.* at 171, 98 S.Ct. at 2684. To mandate an evidentiary hearing, the Court required that the attack on the warrant "must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Id.* Rather, the Court required "allegations of deliberate falsehood or of reckless disregard for the truth [which] must be accompanied by an offer of proof." *Id.* The Court said that the allegations "should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons." *Id.* "Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." *Id.* Continuing, the Court said that "[a]llegations of negligence or innocent mistake are insufficient." *Id.*

In *United States v. Leon, supra,* 468 U.S. at 914, 104 S.Ct. at 3416, the Court explained that because reasonable minds may differ as to whether a particular affidavit establishes probable cause, the preference for warrants is most appropriately effectuated by according great deference to a magistrate's determination. Citing the *Franks* case, the

Court stated that the deference accorded to a magistrate's determination of probable cause "is not boundless ... [and] does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based." *Id.* It observed that reviewing courts will not defer to a warrant based on an affidavit that does not provide the magistrate with a substantial basis for determining the existence of probable cause; that sufficient information must be presented to the magistrate to allow that official to determine probable cause; and the magistrate's action cannot be a mere ratification of the bare conclusions of others. *Id.* at 915, 104 S.Ct. at 3416.

The Court emphasized that "the exclusionary rule was designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Id.* at 916, 104 S.Ct. at 3417. It said that "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Id.* at 918, 104 S.Ct. at 3418. In this regard, the Court questioned whether the exclusionary rule has a deterrent effect when the offending officers "acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment." *Id.*

As to the standard of reasonableness, the Court determined that it was an objective, rather than a subjective one, and required that "officers have a reasonable knowledge of what the law prohibits." *Id.* at 919 n. 20, 104 S.Ct. at 3419 n. 20. Thus, where the officers' conduct is objectively reasonable, the Court said that excluding the evidence would not further the ends of the exclusionary rule in any appreciable way. This is particularly true, the Court said, when an officer acting with objective good faith has obtained a search warrant and acted within its scope. *Id.* at 920, 104 S.Ct. at 3419. The Court explained that it is the magistrate's responsibility to establish whether the officer's allegations established probable cause, and accordingly an officer cannot be expected to question the magistrate's

probable cause determination, or his judgment that the warrant is otherwise technically sufficient. *Id.* at 921, 104 S.Ct. at 3419. Nevertheless, the Court said that because the officer's reliance must be objectively reasonable, there may be cases where the officer "will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922–23, 104 S.Ct. at 3420.

The Court concluded that suppression was an appropriate remedy (1) if the magistrate, in issuing a warrant, "was misled by information in an affidavit that the affiant knew was false or would have known was false except for a reckless disregard of the truth," or (2) "in cases where the issuing magistrate wholly abandoned his judicial role ... [so that] no reasonably well trained officer should rely on the warrant," or (3) in cases in which an officer would not "manifest objective good faith in relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or (4) in cases where "a warrant may be so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume [the warrant] to be valid." *Id.* at 923, 104 S.Ct. at 3421. Thus, as summarized by the Court, 468 U.S. at 926, 104 S.Ct. at 3422, "[i]n the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Id.* at 926, 104 S.Ct. at 3422.

In *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984), the Court, in commenting upon its holding in *Leon,* said that the issue was whether the officers reasonably believed that the search they conducted was authorized by a valid warrant, namely, "whether there was an objectively reasonable basis for the officers' mistaken belief." 468 U.S. at 988, 104 S.Ct. at 3428. The Court declined to establish a rule that an officer must disbelieve a

magistrate who has just advised him, "by word and by action, that the warrant he possesses authorizes him to conduct the search he had requested." *Id.* at 989–90, 104 S.Ct. at 3428. *See also Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

For purposes of this case, we accept the determination that the warrant was not issued upon probable cause. Accordingly, in the words of *Leon,* "our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." 468 U.S. at 922 n. 23, 104 S.Ct. at 3420 n. 23.

*Peterson v. State,* 281 Md. 309, 379 A.2d 164 (1977), *cert. denied,* 435 U.S. 945, 98 S.Ct. 1528, 55 L.Ed.2d 542 (1978), sets forth the Maryland law regarding stale probable cause. That case involved an application for a search warrant, which alleged facts to establish that the defendant's apartment was used in connection with illicit trafficking in narcotic drugs. The question before the Court was whether probable cause supporting the warrant was stale. In addressing this question, we first referred to *State v. Edwards,* 266 Md. 515, 295 A.2d 465 (1972). That case recognized that there is probable cause justifying the issuance of a warrant if the affiant " 'had reasonable grounds at the time of his affidavit and the issuance of the warrant for the belief that the law was being violated on the premises to be searched, and if the apparent facts set out in the affidavit are such that a reasonably discreet and prudent man would be led to believe that there was a commission of the offense charged.' " 266 Md. at 519, 295 A.2d 465, quoting from *Dumbra v. United States,* 268 U.S. 435, 441, 45 S.Ct. 546, 548, 69 L.Ed. 1032 (1925). It follows from *Edwards,* we said in *Peterson,* that "if the facts set out in the affidavit are 'stale,' the affiant would not have reasonable grounds at the time of his affidavit and the issuance of the warrant for the belief that the law was being violated on the premises to be searched." 281 Md. at 314, 379 A.2d 164. In determining whether probable cause may be stale, we

adopted the following from *Garza v. State,* 120 Tex.Crim. 147, 149, 48 S.W.2d 625 (1932):

"The affidavit for a search warrant on probable cause, based on information and belief, should in some manner, by averment of date or otherwise, show that the event or circumstance constituting probable cause, occurred at the time not so remote from the date of the affidavit as to render it improbable that the alleged violation of law authorizing the search was extant at the time the application for the search warrant was made."

*Peterson, supra,* 281 Md. at 314, 379 A.2d 164.

We observed that there was nothing in the search warrant statute, Maryland Code (1987 Repl.Vol.), Art. 27, § 551, nor in our cases, which required that the facts alleged in the application to establish probable cause must result from observations made within any particular time before the issuance of the warrant. 281 Md. at 315, 379 A.2d 164. We accepted the view that the remoteness of the facts observed from the date of issuance of the warrant is an element to be considered in the probable cause determination. *Id.* Citing *State v. Edwards, supra,* we said that failure of the affidavit to state the time of the events relied upon to show probable cause is not conclusive as to whether the premises to be searched probably contained contraband on the date the warrant was issued. *Id.* at 316, 379 A.2d 164. We concluded, again with reliance upon *Edwards,* "that the very language of an affidavit, even though not specifying an exact date or time, when taken as a whole, may be indicative of a present violation." *Id.*

We set forth a number of cases in *Peterson* to the effect "that where the affidavit properly recites facts indicating activity of a protracted and continuous nature, or a course of conduct, the passage of time becomes less significant, so as not to vitiate the warrant." *Id.* at 317–18, 379 A.2d 164. Specifically, we noted cases which held that "whether a past probable cause is still continuing at the time of the application for a search warrant is not determined merely by the passage of time; it may also depend on the particular kind

of criminal activity involved, the length of the activity, and the nature of the property to be seized." *Id.* at 318, 379 A.2d 164. Contrariwise, we also delineated the holdings in a number of cases in which the search warrant was found to be invalid because the underlying facts were too remote in time from the date of the affidavit and were not sufficient to show that the criminal activity continued up to or about the time of the issuance of the warrant. *Id.*

In considering whether probable cause is stale at the time of the application for the search warrant, we enumerated several factors that bear on this issue, *i.e.*, whether the criminal activity was regenerating, the criminal entrenched, and the thing to be seized, while easily transferable, was just as easily replaced. *Id.* at 321, 379 A.2d 164. Applying these criteria to the drug trafficking involved in *Peterson*, and taking into account that there was a clear indication "that the activity was continual, a course of conduct regularly followed over a protracted time," we concluded that it was probable that Peterson kept the contraband in the privacy of his apartment, even absent observed activity as to that location during the later stages of police surveillance. We said that when the affidavit is tested in a common sense and realistic fashion, the probable cause, in the circumstances of that case, was not "stale," but existed at a time not so remote from the date of the affidavit as to render it improbable that the alleged violation of the law was extant at the time the application for the search warrant was made. *Id.* at 322, 379 A.2d 164.

The earlier case of *State v. Edwards, supra,* involved a search warrant which did not specify any date of the claimed criminal activity for which the search warrant was issued. Even though the affidavit for the warrant did not state the time of the events relied upon to show probable cause, we recognized the existence of the "present tense rule" of interpretation of affidavits for search warrants. 266 Md. at 518, 295 A.2d 465. In this connection, we took cognizance of Supreme Court cases recognizing that search warrants are normally drafted by nonlawyers in the midst

of a criminal investigation and, for that reason, elaborate specificity once exacted under common law pleadings is not required. *Id.* at 520, 295 A.2d 465. It was in this context that we said that an affidavit for a search warrant, "while not specifying in so many words an exact date or time, when taken as a whole may be indicative of a present violation." *Id.* 281 Md. at 321, 379 A.2d 164.

As earlier indicated, the application for the warrant in this case was detailed and specific as to some averments, but lacked specificity as to the precise dates upon which the affiants conducted their surveillance and made their observations. The affidavit initially focused on information received by the affiants in February of 1988 that Connelly and Edenton were meeting in the evenings in Connelly's video store in furtherance of described illegal lottery and gambling activities. The affidavit thereafter stated that surveillance was conducted "on numerous occasions" at the store and it chronicled a continuous relationship between Connelly and Edenton involving illegal gambling, with Edenton regularly coming to the store immediately prior to the 7:30 p.m. time that the state lottery number was drawn.

The affidavit then focused upon Edenton's activities, stating that over a period of "several months," he was observed from 4 p.m. to 7:30 p.m. These activities described an ongoing pattern of contacts between Edenton and other named individuals which was highly suggestive of an illegal gambling and lottery enterprise based at Connelly's store; that the timing of these daily contacts was related to Edenton's later "same-day" visits to Connelly's store; and that the persons involved in these activities had criminal records for illegal gambling (this being an element to be considered in the probable cause determination, *see Gatewood v. State,* 244 Md. 609, 616, 224 A.2d 677 (1966)).

■ There is no "bright-line" rule for determining the "staleness" of probable cause; rather, it depends upon the circumstances of each case, as related in the affidavit for the warrant. *See, e.g., United States v. Hernandez-Es-*

*carsega,* 886 F.2d 1560 (9th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3237, 111 L.Ed.2d 748 (1990) (probable cause not stale where last event occurred almost one year before the warrant issued, but where there was evidence of protracted criminal activity); *United States v. Craig,* 861 F.2d 818 (5th Cir.1988) (where affidavit described criminal activity of long standing, information need not be regarded as stale even if fairly long periods of time have elapsed between information and the issuance of the warrant). *See also Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), *aff'g* 24 Md.App. 128, 331 A.2d 78 (1975) (rejecting the argument that the information on which the affidavits was based was stale because of a three-month delay in the application for the search warrant).

These cases recognize, as we held in *Peterson* and *Edwards,* that the language of the affidavit, even though failing to specify exact times or dates, may be indicative of a present violation when the affidavit is considered in its entirety. It is possible to read the affidavit in this case as presenting stale probable cause, as the Court of Special Appeals concluded. It is also possible to determine that the affiants, in preparing the affidavit, and relating their investigatory observations, were describing a continuing criminal enterprise, ongoing at the time of their application, and thus the probable cause relied upon was not stale. That their affidavit was not prepared with lawyer-like precision does not, of course, disentitle the affiants to the benefit of *Leon's* good faith exception. On the other hand, in applying *Leon's* objectively reasonable good faith test, the affiants are deemed to be reasonably well-trained police officers with some knowledge "of what the law prohibits." *Leon, supra,* 468 U.S. at 919, n. 20, 104 S.Ct. at 3419, n. 20. Thus, as *Leon* holds, because the officer's reliance on the warrant must be objectively reasonable, there will be cases where the officer "will have no reasonable grounds for believing that the warrant was properly issued." 468 U.S. at 922–23, 104 S.Ct. at 3420.

In his motion to suppress, Connelly did not claim that the affiants made false statements, either intentionally or with a reckless disregard for the truth. Rather, he suggests that it was the affiants' purpose, by not including the specific dates of their surveillance, to affirmatively mislead the magistrate into believing that at the time they sought the warrant, in November of 1988, probable cause existed to believe that criminal activity was then ongoing and that evidence of the crime would be found in Connelly's residence and video store. Given these circumstances, Connelly argues that the affiants could not have harbored an objectively reasonable belief in the existence of probable cause, as required by *Leon,* because the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.

As Connelly did not request a hearing pursuant to the procedure authorized by *Franks v. Delaware, supra,* and thereby create an evidentiary record with respect to the claimed misrepresentation of the affiants, we are limited to the affidavit itself in determining the applicability of the *Leon* good faith exception. Even though the warrant was found to be invalid by the intermediate appellate court on staleness grounds—a conclusion with which we do not take issue—nevertheless, as the cases reflect, considerations of staleness of probable cause turn on the circumstances of each particular case, and reasonable minds may differ as to the correct determination. Accordingly, applying *Leon's* objective test in this case, we think that the officers, exercising professional judgment, could have reasonably believed that the averments of their affidavit related a present and continuing violation of law, not remote from the date of their affidavit, and that the evidence sought would likely be found at Connelly's store and at his residence.

▉ As application of the good faith exception to the allegations of the affidavit presents an objectively ascertainable question, it is for the appellate court to decide whether the affidavit was sufficient to support the requisite belief that the warrant was valid. *See Leon, supra,* 468

U.S. at 926, 104 S.Ct. at 3422; *United States v. Craig, supra,* 861 F.2d at 821. Thus, the remand to the trial court ordered by the Court of Special Appeals in this case to decide, as a question of fact, whether the affiants acted in good faith in believing that probable cause existed, was not appropriate. Consequently, we hold that the evidence seized by the officers from Connelly's video store and residence was properly admitted at his trial and that his convictions must be affirmed.

JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY. COSTS IN THE COURT OF SPECIAL APPEALS AND IN THIS COURT TO BE PAID BY THE PETITIONER, MICHAEL EDWARD CONNELLY.