839 A.2d 806

**Samuel Marcel HOLLAND**

v.

**STATE of Maryland.**

No. 2045, Sept. Term, 2002.

Court of Special Appeals of Maryland.

Dec. 23, 2003.

352

Christina DeLeon, Margaret L. Lanier (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Rachel Marblestone Kamins, Michelle W. Cole (J. Joseph Curran, Jr., on the brief), Baltimore, for appellee.

Panel: HOLLANDER, ADKINS, and JOHN, J. BISHOP JR. (Retired, specially assigned), JJ.

HOLLANDER, Judge.

Following a bench trial in the Circuit Court for Caroline County, Samuel Marcel Holland, appellant, was convicted of first degree burglary, attempted robbery, and attempted theft under five hundred dollars.[1] Holland, who was seventeen years old at the time of the incident, was sentenced to a term of ten years, with all but five years suspended, for the first

---

1. Appellant was acquitted of carrying a handgun and second degree assault.

degree burglary offense, and a concurrent term of ten years, with all but five years suspended, for attempted robbery. The court merged the theft conviction for sentencing purposes.

Appellant raises the following issues on appeal:

I. Is the evidence sufficient to support a conviction for first degree burglary, when there was no evidence of a breaking?

II. Did the trial court err in denying relief for a discovery violation?

III. Did the court err in denying appellant's motion to suppress evidence recovered in the course of a search pursuant to a warrant, when, with reckless disregard for the truth, the affiant omitted crucial information as to the identification of the suspect?

For the reasons set forth below, we shall reverse the burglary conviction but affirm the remaining convictions.

## FACTUAL SUMMARY

Just after dark on March 3, 2002, eighty-one year old James William Carter, also known as "Ham," left his home at 105 North Fifth Street in Denton to purchase chewing tobacco at a nearby convenience store. On route to the store, Carter passed appellant at the intersection of North Fifth and Gay Streets, approximately thirty feet from Carter's home. Appellant, who was dressed in a heavy black coat and baggy black pants, was still at the intersection when Carter returned from the store.

Upon returning to his house, Carter closed the screen door but did not lock it. Moreover, he left the wooden door to his home ajar some twelve to fourteen inches. When Carter sat down to watch television, he heard a knock at the door. Thinking that it was one of the neighborhood boys, Carter responded, "come in." At that point, someone opened the screen door and stood in the area between the screen door and the wooden door.

After a brief silence, the individual demanded that Mr. Carter give him his money. When Carter did not respond,

the suspect again demanded money while he "hit for his [coat] pocket." Although Mr. Carter did not know whether the suspect had a gun, he thought he had "something." Carter refused to give the assailant any money. Instead, he called out for his roommate, Edward Taylor. Just as Mr. Taylor responded, the suspect fled.

Carter testified that he was only able to see the assailant's eyes, nose, and mouth, because the suspect's face was partially covered by the hood of his parka. Mr. Carter further stated that the suspect "wasn't no grown person." Moreover, he was convinced that the assailant was the same person he had seen on the corner when he (Carter) went to and from the store.

Although the police came to Carter's residence with some photographs, Mr. Carter was unable to identify the assailant. He stated: "No, I didn't see it in there." Yet, in court, Carter identified appellant as his assailant. Carter acknowledged, however, that he "couldn't see [the assailant's] eyes real good because he had it [i.e., the parka hood] pulled close."

The trial court then questioned Mr. Carter at length about how he knew that appellant was the assailant if he could not see the suspect's face. Carter insisted that appellant was the assailant. The following exchange is noteworthy:

[THE COURT]: Now I understand when the person came in, you couldn't tell who was under that hood?

[MR. CARTER]: No, ma'am, no ma'am.

[THE COURT]: When you were walking to the Farm Store and you noticed the person on the corner wearing the parka, could you see that person's face?

[MR. CARTER]: No.

[THE COURT]: Okay when you came back from the Farm Store and you saw that same person on the corner ... ?

[MR. CARTER]: That's right.

[THE COURT]: Could you see that person's face?

[MR. CARTER]: No, ma'am, I couldn't see him until he come and knocked on my door.

[THE COURT]: All right and then you just saw his eyes, his nose and his mouth?

[MR. CARTER]: That's right, that's all I could see.

[THE COURT]: Now a little earlier you told Mr. Walker that it was the boy standing on the corner, the person on the corner was the Defendant?

[MR. CARTER]: It wasn't him.

[THE COURT]: That it was him, you pointed to Mr. Holland, that that was the boy standing on the corner with the parka?

[MR. CARTER]: Yeah, yeah.

[THE COURT]: How do you know that if you didn't see his face?

[MR. CARTER]: I could see it but he's the only, he's the only one out on the street.

[THE COURT]: Okay but if you didn't see his face, how do you know it was Mr. Holland?

[MR. CARTER]: Oh, it was him.

[THE COURT]: Okay, can you tell, it's very important, how do you know it was him if you couldn't see his face?

[MR. CARTER]: I couldn't see his face until he come in the house but if he hadn't had that hood pulled up on his head, I could have told that, I could have saw his face but I couldn't see. He had it all pulled up like it was freezing out there.

[THE COURT]: I understand that but at what point did you decide that that person in the hood was Mr. Holland?

[MR. CARTER]: That's the only one I saw standing there.

[THE COURT]: Okay, let's go back, okay, when you passed the person on the corner, you couldn't see their face?

[MR. CARTER]: No ma'am.

[THE COURT]: When did you decide in you own mind that that person who's face you couldn't see was Mr. Holland?

[MR. CARTER]: Well, I couldn't say but one thing about it but when I come back and I kind of looked over there, now I say in mind, something ain't right. He's standing there, why he [sic] standing there and nobody else because any

other time all them street, street be full but he was the only one on that corner.

[THE COURT]: Okay, this is real, real important Mr. Carter and you've done a great job testifying and you've been, I've understood everything you've said but you have to understand that I need to know why you think it's that young man over there that was in that parka?

[MR. CARTER]: Well, I'm going to tell you, that's the only one I saw on that corner.

[THE COURT]: Okay but you just told me you didn't, you couldn't see their face?

[MR. CARTER]: I could see, you're right . . .

[THE COURT]: Okay . . .

[MR. CARTER]: . . . I couldn't see a face but still, I still say he was the one on that corner.

[THE COURT]: Okay you need to tell me why you think that, why, I mean how, I mean it could have been somebody else in that parka?

[MR. CARTER]: No ma'am, no ma'am, no ma'am.

[THE COURT]: Then you need to tell me why . . .

[MR. CARTER]: No ma'am, no ma'am, nuh-uh.

[THE COURT]: Okay . . .

[MR. CARTER]: That was him.

[THE COURT]: Okay, so what . . .

[MR. CARTER]: Now I might, I might (inaudible) but one thing about it, no ma'am, he was the one on that corner because if a person standing on the corner and he's standing when you go by and you come back, they got to be moved.

[THE COURT]: Okay but you need, okay Mr. Carter you need to tell me why you think it was him?

[MR. CARTER]: I know it was him.

[THE COURT]: Tell me how you know it was him if you couldn't see . . . ?

[MR. CARTER]: I couldn't see his face good but he was the one.

Mr. Taylor testified that he responded to Mr. Carter's call and saw "a person going out of the door from the side view and then I saw the back view of this person going outside the door. . . ." He noticed the individual's walk, which he described: "[T]he type of walk that they used, like a lazy person walk or a slur walk."

Mr. Taylor described the suspect as a dark complected male, about 120 to 130 pounds, approximately 5′2″ tall. He wore a dark colored, hooded jacket with fur around the outside edge of the hood and dark, baggy, "bulky" clothes. Nevertheless, when Taylor was asked if he saw the face of the person who entered his residence, Mr. Taylor answered, "No, I did not."

Taylor recalled that Carter said the suspect had tried to rob him (Carter). Accordingly, Taylor called the police. Taylor testified: "I gave them a description of the person that I saw leaving out of the doorway. . . ." Then, Taylor went outside to look for the assailant. As he "went around the street," Taylor "noticed the police had a person standing outside on the passenger side talking to him. . . ." Taylor claimed that person matched the description of the assailant. He also thought this person lived in that area. However, he noticed that the person was not wearing any bulky clothes. Rather, he wore a white tee shirt and jeans. Nevertheless, Taylor recognized the individual because of his "lazy" walk.

A few days after the incident, Taylor called the police again to report that, across the street from their home, he saw "that same type of person with that type of clothes on. . . ." Because of the person's walk and clothing, he concluded that the person across the street was the assailant. The following testimony is pertinent:

[PROSECUTOR]: Can you describe what you saw?

[MR. TAYLOR]: The person had that same type of slow walk with a little dip in his walk and I told Ham [Mr. Carter], I said that's that person and Ham looked over there, he said it sure is, just like that and that's when I had called the police.

[PROSECUTOR]: And did you provide information to the police?

[MR. TAYLOR]: Yes I did.

After the incident, Taylor was shown a photo array, but he was unable to make an identification. Nevertheless, Taylor made an in-court identification of appellant. Taylor explained that he identified Holland based upon "[h]is height and his size" and "he had that same type walk." Indeed, Taylor insisted that "[t]here's no question at all" that Holland was the perpetrator of the crime.

Patrolman First Class ("PFC") Thomas Conneely, Jr. of the Denton Police Department testified that, on March 3, 2002, at approximately 6:30 p.m., he went to 105 North Fifth Street in Denton in response to a call about an attempted armed robbery. There, he met Carter and Taylor. Among other things, they told Conneely that they could not see all of the suspect's face, because it was partially covered by his hood.

After the interview, the officer "broadcast a lookout giving a description of the suspect." PFC Conneely then received information from PFC Michael Rodano, indicating that appellant had been seen wearing the described clothing. As a result, appellant was developed as a suspect.

PFC Conneely stopped appellant "a half an hour to an hour" after he interviewed Carter and Taylor. At the time, appellant was wearing a black nylon "running suit." PFC Conneely conducted a pat-down and told appellant that "there had been an attempted robbery or a robbery, home invasion." He also informed appellant that he resembled the description of the suspect involved in the "attempted robbery" at North Fifth Street. Appellant told PFC Conneely that he could not have been involved in the incident because he was at a relative's house, located at 106 North Fifth Street. After talking to appellant, the officer continued to patrol the area, but was unable to locate anyone else who matched the description of the assailant.

On the day of the incident, Conneely also responded to 106 North Fifth Street, where appellant's mother, Francis Robin-

son, and appellant's cousin, Vanessa Hudson, were seated on the front porch, along with other unidentified persons. While PFC Conneely spoke with Ms. Robinson, appellant and his brother, Michael Holland, arrived. Conneely recalled that appellant asserted: " 'I would have got money if I robbed somebody.' "

Following his encounter with appellant, PFC Conneely prepared a photo array of six individuals, which included appellant. PFC Conneely related that he showed the array to both Carter and Taylor, neither of whom could identify a suspect.

On March 4, 2002, Conneely returned to the victim's residence to conduct another interview. Thereafter, Conneely obtained a search warrant for appellant's residence at 515 Lincoln Street, which was executed on March 6, 2002. Conneely told appellant that a BB gun had been recovered during the search. Appellant responded that he found the BB gun at the basketball court and concealed it behind his house because he knew that his mother would not approve.

PFC Michael Rodano testified that he saw appellant on the day of the incident. He related that appellant was wearing a fur-trimmed, hooded jacket matching the one described by Mr. Carter. This information was relayed to PFC Conneely.

Patrolman Daniel Franklin testified that, at the outset of the search, appellant was served with the warrant. Franklin stated: "I believe he was reviewing the charges with his mother and in a louder voice than the rest he had been talking, he said 'assault, I didn't assault that man.' " As we discuss in more detail, *infra*, appellant unsuccessfully moved to strike this statement on the ground that the State failed to disclose it in discovery.

During the search of appellant's residence, the police recovered a navy blue parka with a fur lined hood. Two unused Crossman brand CO2 cartridges were found in an upstairs bedroom. A plastic baggie containing suspected crack cocaine was also seized, but it was later found to contain pebbles and candle wax. In addition, in the rear yard the police recovered

a chrome colored Daisy CO2–powered BB gun with a black handle.

Appellant gave a written statement to the police after his arrest in which he said:

I was chilling all day playing with my dogs at my house[.] I don't know what time I was on the block with me and my brother and somebody and he went home and me and Mic went home I was taking my bath and Mic went outside and in the fourt [sic] of the house then he came in the house an[d][sic] side [sic] some body got rob [sic] and they said it was me my [sic] brother went back outside and then I came out[.]

I don't know about what time I was over Vanessa because it was my mom and sister Vanessa was backup [sic] at the time when the cops came to her house so she got scared and did not know what to say[.]

I find [sic] the gun to the [sic] playground Tuesday[.]

Vanessa Hudson, appellant's cousin, testified that appellant was not at her home at the time of the incident. But, she claimed that appellant had asked her to tell the police that he was at her residence at that time. Ms. Hudson further testified that appellant was close to her children, and her children may have seen him at her house at the time of the incident.

At the close of the State's case, the court granted appellant's motion for judgment of acquittal as to the charge of wearing, carrying, and transporting a handgun. Appellant also moved for acquittal as to the burglary charge, claiming that the evidence of a breaking was insufficient to support a burglary conviction. Defense counsel said: "The evidence is that, well, one of the elements of burglary is a break in and according to case law, break in requires entering by trespass. . . ." The following colloquy ensued:

THE COURT: Well but I think it also says it doesn't preclude if someone used it by trickery, knocking on the door. To come in with the intent of robbing I think constitutes breaking.

[DEFENSE COUNSEL]: Well, trickery, yeah but constructive breaking would be using trickery, a falsehood to gain entry. Now I submit knocking on a door is not trickery. . . . It's not a breaking, there's not fraud involved. I think the cases where that would apply would be where someone lies to get in or they impersonate someone else to get in.

THE COURT: So if he had knocked on the door and said I'm the mailman, he said come on in that would constitute breaking but if he's smart enough. . . .

[DEFENSE COUNSEL]: Like if he had some story.

THE COURT: . . . not to say anything at all and just wait to see if someone says come in, that's not a breaking?

[DEFENSE COUNSEL]: No, it's, it could be . . . no, it's not. Part of, I mean . . .

THE COURT: Well my idea of the trickery is you knocking on the door. That's, I mean, in other words, most people that gain entry will ring a doorbell and knock on the door and if someone inside doesn't come to the door to see who it is and just says come on in, in my view that's still gaining entrance by tricking someone to think you've got legitimate business that you're ringing the doorbell or knocking on the door.

After the court denied the motion for judgment, appellant called Thomas Harris, an investigator with the Public Defender's Office, as his only witness. Harris testified that on July 12, 2002, Taylor told him that when he (Taylor) entered the room, the suspect was leaving and had his back turned toward Mr. Taylor. Moreover, Taylor said he did not see the suspect's face. Mr. Taylor also told Mr. Harris that he did not see the suspect walk to the corner, because at that point Mr. Taylor had turned to call 911. When he turned back, however, he saw the suspect standing on the corner.

Harris again spoke to Taylor on July 17, 2002, because the statement of probable cause had been issued and was inconsistent with what Taylor had told Harris. Harris testified that he asked Taylor if he had seen the suspect on March 3, 2000,

standing with a group of people on a porch, and Taylor told Mr. Harris that he had not. But, Taylor saw the suspect standing on the corner.

The State called Mr. Taylor in rebuttal. He testified that, a few days after the incident, he called the police a second time, because he saw "the same individual" standing across the street, and he "made the same identification."

We shall include additional facts in our discussion.

## DISCUSSION

### I.

 Appellant was convicted of first degree burglary, in violation of Md.Code Ann., Art. 27, § 29.[2] It provided:

(a) *In general.—A person may not break and enter* the dwelling of another with the intent to commit theft or a crime of violence.

(b) *Penalty.*—A person who violates this section is guilty of the felony of burglary in the first degree and on conviction is subject to imprisonment for not more than 20 years.

Appellant contends that the evidence was insufficient to support his conviction for first degree burglary because there was no evidence of either an actual or constructive breaking of Carter's home. With regard to an actual breaking, appellant asserts that "no reasonable fact finder could have found beyond a reasonable doubt that appellant broke into Mr. Carter's residence, because the entry was with consent...." Noting that "Mr. Carter shouted out an invitation to enter," appellant contends the "entry [was] based upon consent," and a "permissive or consensual entry is not a breaking" under Maryland law. In addition, appellant argues that no breaking occurred because "the screen door was closed but not locked" and "[t]he inside door was sitting open."

---

2. The trial was held in September 2002. Effective October 1, 2002, this provision was recodified in Md.Code (2002), Crim. Law Art., § 6–202(a).

Holland also maintains that the evidence did not establish a constructive breaking. In this regard, he observes that the State did not show that he gained entry through fraud, trickery, or artifice.

Further, appellant complains that, in the prosecutor's closing argument, "the prosecutor argued that there was a burglary here, because there was an entry with the intent to commit theft." He recognizes that, in "some other states, a mere entry can constitute burglary, as long as at the time of the entry, the defendant had the intent to commit a crime within." Appellant adds: "If the 'entry with intent to commit a crime' formulation were the law in Maryland, the evidence here would be sufficient." But, appellant insists that, under Maryland law, an entry does not amount to a constructive breaking merely because the entry is made with an illegal intent.

The State counters that the evidence was sufficient to sustain Holland's conviction. In its view, the evidence satisfied "the 'entering' element necessary to sustain [appellant's] burglary conviction," and established both an actual breaking and a constructive breaking. Pointing to appellant's "felonious intent," the State asserts: "Holland's act of knocking and remaining quiet, with the sole intent to take Carter's money, was sufficient evidence of an intent to deceive." In addition, the State contends that "Holland's act of knocking and remaining silent constituted a constructive breaking."

In reviewing a sufficiency claim, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 313–14, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The issue is whether the verdict was supported by sufficient evidence that, directly or circumstantially, supports a rational inference of facts that could convince a trier of fact of the defendant's guilt beyond a reasonable doubt. *State v. Albrecht*, 336 Md. 475, 478–79, 649 A.2d 336 (1994). Put another way, "[t]he limited question before an appellate court is 'not whether the evidence *should have* or

*probably would have* persuaded the majority of fact finders but only whether it *possibly could have* persuaded *any* rational fact finder.'" *Mora v. State,* 123 Md.App. 699, 727, 720 A.2d 934 (1998), *aff'd on other grounds,* 355 Md. 639, 735 A.2d 1122 (1999) (quoting *Fraidin v. State,* 85 Md.App. 231, 241, 583 A.2d 1065, *cert. denied,* 322 Md. 614, 589 A.2d 57 (1991) (emphasis in original)).

When, as here, the case is tried without a jury, the "appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8–131(c). *See State v. Raines,* 326 Md. 582, 589, 606 A.2d 265, *cert. denied,* 506 U.S. 945, 113 S.Ct. 390, 121 L.Ed.2d 299 (1992).

We agree with appellant that there was insufficient evidence to support a conviction for burglary, whether based on the theory of an actual or a constructive breaking. We explain.

The evidence showed that appellant was silent as he knocked on Carter's door. Nor did appellant make any deceptive or threatening comments. In response to appellant's knock, Carter answered, "come in." At that point, appellant opened the unlocked screen door and stood between that door and the wooden door that Carter had left ajar. Carter testified:

> When [appellant] come in, he come in there and he stayed inside the screen door, didn't quite shut all the way, he stand in the screen door and ain't nobody in the wooden door and so he come, he come in there and so I didn't say nothing....
>
> [PROSECUTOR]: Did he move the door at all?
>
> \* \* \*
>
> [CARTER]: No, the wooden door, see I had a latch, a bundle at the wooden door, I had it open.
>
> [PROSECUTOR]: Okay....
>
> [CARTER]: And the screen door wasn't even locked.

■ To be sure, a breaking may occur by opening a closed but unlocked door. *See Robinson v. State,* 67 Md.App. 445, 458, 508 A.2d 159, *cert. denied,* 307 Md. 261, 513 A.2d 314 (1986); *Reagan v. State,* 2 Md.App. 262, 267–68, 234 A.2d 278 (1967). But, the State does not contend that appellant committed an actual breaking merely because he opened the unlocked screen door.

*Finke v. State,* 56 Md.App. 450, 468 A.2d 353 (1983), *cert. denied,* 299 Md. 425, 474 A.2d 218, *cert. denied,* 469 U.S. 1043, 105 S.Ct. 529, 83 L.Ed.2d 416 (1984), is instructive in regard to the breaking element of a burglary offense. Finke was convicted of the felony murder of his aunt, who was found stabbed to death in her home. *Id.* at 457–58, 468 A.2d 353. He argued on appeal that the evidence was insufficient regarding the breaking and intent elements of the underlying felony. *Id.* at 466–67, 468 A.2d 353. This Court noted that there was "no direct evidence as to how or under what circumstances" Finke entered his aunt's home, other than his statement to the detective that "he guessed his aunt let him in." *Id.* at 467, 468 A.2d 353. Accordingly, the Court said that "the finding of a trespassory entry, or breaking, essential to the verdict could only have been reached by deduction or inference from evidence of other facts." *Id.*

The Court explained that "[t]he breaking of a dwelling house or other structure, within the meaning of that term as applied to burglary and related statutory crimes, may be actual, as where physical force is applied, or constructive, as where entry is gained through fraud or trickery. It may involve simply lifting a latch or opening a door closed by its own weight." *Id.* at 467, 468 A.2d 353 (citing *Jones v. State,* 2 Md.App. 356, 360, 234 A.2d 625 (1967)); *see Reagan v. State,* 2 Md.App. 262, 267–68, 234 A.2d 278 (1967). The Court went on to state that "[t]urning a doorknob and opening a closed door or merely further opening a door left ajar involves sufficient force to constitute an actual breaking, *provided it is a trespassory act.*" *Id.* (Emphasis added). Nevertheless, the Court cautioned: " 'There is no 'breaking' if a person has a right to enter or *if he enters with the consent of the owner.*' " *Finke,*

56 Md.App. at 467, 468 A.2d 353 (quoting *Martin v. State,* 10 Md.App. 274, 279, 269 A.2d 182 (1970)).

The Court concluded that a rational inference could be drawn from the evidence that Finke "opened the door and entered" his aunt's home "without invitation," given that "he had not visited his aunt for about a year and half and was not expected on this occasion." *Id.* at 479, 468 A.2d 353. Therefore, "in the absence of any legitimate basis for his presence, the jury could have rationally inferred that Finke's entry was trespassory in nature, i.e., a breaking." *Id.*

*Martin v. State, supra,* 10 Md.App. 274, 269 A.2d 182, is also instructive. There, two brothers, Claude and William Martin, were found parked in front of a recently burglarized home with stolen items in their car. *Id.* at 277, 269 A.2d 182. At trial, Claude testified that, on the night in question, his brother approached him at a bar and asked him if he would move a few things around the corner for an individual named Tony, who offered to pay them for their services. *Id.* at 278, 269 A.2d 182. The trial court did not accept Claude's explanation of how he came into possession of the stolen goods and convicted the brothers of burglary. *Id.* at 278, 269 A.2d 182.

On appeal, Claude claimed that the evidence was not sufficient to support his conviction. *Id.* at 276, 269 A.2d 182. Specifically, he asserted that the State failed to prove that Claude, William, or Tony lacked the homeowner's permission to enter the dwelling. *Id.* at 278, 269 A.2d 182. The Court explained that "breaking, as an element of burglary, requires a breach of the dwelling made by a trespass. There is no 'breaking' if a person has a right to enter or if he enters with the consent of the owner." *Id.* at 279, 269 A.2d 182 (citing *Perkins on Criminal Law,* 2d Ed., p. 195; Clark and Marshall, *Law of Crimes,* 7th Ed., § 13.03, pp. 1000–1001.) Because the trial court did not find that the defendants had permission to enter the house, the Court held that the trial court did not err in concluding that the breaking was trespassory; that was a rational inference from the facts and circumstances shown. *Id.*

Appellant relies on *Brooks v. State*, 25 Md.App. 194, 333 A.2d 352 (1975), *aff'd on other grounds*, 277 Md. 155, 353 A.2d 217 (1976), to support his claim that his entry into Carter's residence was consensual rather than trespassory. In *Brooks,* the defendant was convicted of storehouse breaking after he entered a department store while it was open to the public and then secreted himself in the store until after it closed. *Id.* at 195, 333 A.2d 352. This Court held that "whether or not we can term appellant's original entrance into the store to be by trick, fraud, artifice, deception or otherwise, we think it can be fairly said that appellant's failure to leave the premises when the store closed for business made his original entrance a constructive, illegal breaking and entering, *ab initio.*" *Id.* at 198, 333 A.2d 352.

The Court of Appeals affirmed, but on other grounds. *Brooks v. State*, 277 Md. 155, 353 A.2d 217 (1976). It concluded that there was sufficient evidence of an "actual breaking" because the door leading to the shoe department, where appellant had secreted himself, had been pried open. *Id.* at 163, 353 A.2d 217. But, the Court left "for another day, and for other factual findings, the resolution of the question: whether or not one, who enters premises lawfully, such as an invitee, and then, possessing an intent to steal, or commit a felony, manages by stealth or artifice, to remain upon the premises, after the termination of the lawfulness of his presence, can be guilty of either common law burglary or the statutory offense...." *Id.* at 161, 353 A.2d 217.

In this case, Carter acknowledged that appellant merely knocked on the door and, in response, he told appellant to "come in." Thus, there was no actual breaking by appellant in opening the unlocked door; appellant's entrance was consensual. *See Martin*, 10 Md.App. at 279, 269 A.2d 182 ("There is no 'breaking' if a person has a right to enter or if he enters with the consent of the owner."). Because there was no actual breaking by appellant, we next consider the State's claim that appellant's conduct amounted to a "constructive break."

It appears to us that the State offers two primary reasons to support its position that appellant's actions constituted a constructive breaking. First, the State contends that appellant harbored a felonious intent that gave rise to a constructive breaking. The State asserts that appellant's "act of knocking" on Mr. Carter's door while "remaining quiet, with the sole intent to take Mr. Carter's money, was sufficient evidence of an intent to deceive." Notwithstanding Carter's statement of "come in," the State argues that appellant knew he was not invited into Mr. Carter's home because of his illicit purpose. The State adds:

> Indeed, as Holland's acts upon entering Carter's apartment consisted only of repeated demands for money, there was simply no evidence to support the conclusion that Holland had anything other than a felonious intent when he entered Carter's apartment.

Second, the State contends that a constructive breaking occurred based on appellant's trickery and fraudulent conduct. The State asserts: "Holland was posing as someone known to Carter by knocking and failing to announce himself, and therein lies the fraud."

We agree that "[t]he breaking element of burglary 'may be satisfied where it is shown that ... the breaking occurred 'constructively,' through an entry gained by artifice, by fraud, conspiracy, or by threats.' " *Oken v. State*, 327 Md. 628, 662, 612 A.2d 258 (1992) (citation omitted), *cert. denied*, 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993); *see Winder v. State*, 362 Md. 275, 326, 765 A.2d 97 (2001) (defining "constructive breaking to include 'every unlawful entry,' ") (*citing Brooks*, 277 Md. at 159–160, 353 A.2d 217); *Reed v. State*, 316 Md. 521, 524, 560 A.2d 1104 (1989) ("At common law, a constructive breaking occurred 'when entry was gained by fraud or threat of force.' ") (citation omitted); *Jones v. State, supra*, 2 Md.App. at 360, 234 A.2d 625; *Reagan v. State*, 2 Md.App. 262, 267–68, 234 A.2d 278 (1967). However, there was no evidence adduced at trial that appellant used any threats, trickery, or force to gain entry to Carter's home.

■ This is not a case in which appellant gained entry by a false statement that induced Carter to open the door. In other words, appellant did not claim to have a lawful objective and, "upon gaining entry [he] turned out to have no such lawful objective." *Reed,* 316 Md. at 524, 560 A.2d 1104. Nor did appellant respond falsely to an inquiry by Carter; the victim never inquired as to who was at the door or for what purpose. Had Carter posed such an inquiry, appellant's silence might be construed as trickery of some sort. But, absent such an inquiry, Carter did not engage in fraud merely because he stood silent while knocking.

*Oken,* 327 Md. 628, 612 A.2d 258, is instructive. There, the State claimed that the defendant committed a constructive breaking in connection with the first degree murder of Dawn Garvin, whose body was found in her apartment. *Id.* at 634–35, 612 A.2d 258. Witnesses testified that, on several prior occasions, Oken had attempted to gain entry to residences by fraudulently representing to the occupants that he needed to use the telephone. *Id.* at 662, 612 A.2d 258. And, on one occasion, Oken stopped a woman by posing as a policeman. *Id.* The State argued that, based on this evidence, "the jury could have reasonably inferred that Oken employed a similar ruse to gain entry to Dawn Garvin's apartment." *Id.* Oken claimed, *inter alia,* that the evidence was insufficient in regard to the burglary. *Id.* at 661, 612 A.2d 258. The Court of Appeals agreed, concluding that the record was "completely devoid of any evidence showing a breaking, either actual or constructive, of Dawn Garvin's apartment." *Id.* at 663, 612 A.2d 258. Therefore, it reversed Oken's burglary conviction. *Id.*

*Spence v. State,* 51 Md.App. 359, 362, 443 A.2d 648 (1982), *rev'd on other grounds,* 296 Md. 416, 463 A.2d 808 (1983), is also illuminating. In that case, the victim testified that he was at home with his family when, at about 10:15 p.m., his son opened the door in response to a knock. *Id.* at 360, 443 A.2d 648. Two strangers entered the apartment; one remained by the door while the other, the appellant, went into the living room. *Id.* This Court held that the defendant's "mumbling to

gain entrance to the apartment" constituted "an artifice or fraud within the meaning of *Brooks*." *Id.* at 362, 443 A.2d 648.

Under the circumstances of this case, we cannot conclude that appellant's silence while knocking on Carter's door amounted to the kind of trickery or fraud that supports a finding of constructive breaking. Moreover, the State has not provided us with any authority to support its claim that Holland's illicit purpose or motive in knocking on Carter's door, standing alone, constituted a constructive breaking. Accordingly, we shall reverse appellant's first degree burglary conviction.

## II.

Appellant contends that the trial court erred in denying his motion to strike the testimony of Patrolman Daniel Franklin, who testified about a remark allegedly made by appellant upon arrest. Although the defense did not request the statement in discovery, appellant maintains that his statement to Franklin was exculpatory and thus should have been disclosed as "mandatory discovery."

The State maintains that the issue is not preserved, because appellant failed to object to the testimony.[3] Even if preserved, the State contends that the issue lacks merit. We agree with the State that the contention is not preserved because appellant did not timely object. The following exchange at trial is relevant:

[PROSECUTOR]: Did you have an occasion to be at the police station when the Defendant was interviewed or served with a warrant?

[PATROLMAN FRANKLIN]: Yes I did.

---

**3.** The State also points out that Holland did not raise this argument at trial. Instead, he argued there that the State should have provided the material as requested. When it became apparent that the defense had not made such a request, appellant then claimed the statement should have been produced as a statement by the defendant to a State agent, pursuant to Maryland Rule 4–263(a)(2).

[PROSECUTOR]: Could you tell the Court what if anything the Defendant said or what response he had with regard to that process?

[PATROLMAN FRANKLIN]: When he was given his copy of the warrant after it had been served, I believe he was reviewing the charges with his mother and in a louder voice than the rest he had been talking [sic], he said assault, I didn't assault that man.

[PROSECUTOR]: Okay, did he make any other statement that you can . . . ?

[PATROLMAN FRANKLIN]: He didn't make anything else that I could understand.

As the above exchange reflects, appellant's counsel did not object to the direct testimony. Then, on cross-examination, the following occurred:

[APPELLANT'S COUNSEL]: Did you talk to Mr. Taylor about the case?

* * *

[PATROLMAN FRANKLIN]: Yes sir.

[APPELLANT'S COUNSEL]: Okay and did he identify . . .

[PROSECUTOR]: Objection.

THE COURT: Outside the scope?

[PROSECUTOR]: Yes, Your Honor.

THE COURT: Sustained.

[APPELLANT'S COUNSEL]: Did you take any notes or include this statement by Sam Holland in a police report?

[PATROLMAN FRANKLIN]: Did I put it in a police report?

[APPELLANT'S COUNSEL]: Yes?

[PATROLMAN FRANKLIN]: No. I did not.

[APPELLANT'S COUNSEL]: Did Officer Conneely?

[PATROLMAN FRANKLIN]: I'm unsure.

[APPELLANT'S COUNSEL]: Okay . . .

[PATROLMAN FRANKLIN]: It's not my report. I didn't put anything in any report. It's Officer Conneely's report.

[APPELLANT'S COUNSEL]: No further questions, Your Honor although I would move to strike the statement as not previously provided.

As we have shown, appellant's counsel did not object when the question was posed by the State or when the answer was provided. Therefore, the contention is waived. *See Bruce v. State,* 328 Md. 594, 627–30, 616 A.2d 392 (1992) (stating that an objection must be made when question is asked or, if objectionable material comes in unexpectedly in answer, then at that time by motion to strike), *cert. denied,* 508 U.S. 963, 113 S.Ct. 2936, 124 L.Ed.2d 686 (1993); *Williams v. State,* 99 Md.App. 711, 718, 639 A.2d 180 (1994) (noting that because an objection was not immediately made, issue was not preserved for review), *aff'd,* 344 Md. 358, 686 A.2d 1096 (1996).

Even if the issue had been preserved, we would agree with the trial court's ruling. We explain.

■ At trial, appellant's counsel argued that Md. Rule 4–263(a)(2) required mandatory disclosure of information regarding appellant's statement, even without a defense request, because it was made to a State agent, Patrolman Franklin, and the content was exculpatory. The trial court found that appellant's statement was made to his mother, in the presence of a State agent. Further, it determined that appellant's statement was not exculpatory or mitigating. Therefore, the court ruled that the State was not obligated to produce the statement in discovery in the absence of a request, and appellant made no such request.

Appellant renews his contentions on appeal. In our view, they lack merit.

Maryland Rule 4–263 provides, in pertinent part:

Discovery and inspection in circuit court shall be as follows:

(a) ***Disclosure without request.*** Without the necessity of a request, the State's Attorney shall furnish to the defendant:

(1) Any material or information tending to negate or mitigate the guilt or punishment of the defendant as to the offense charged;

(2) Any relevant material or information regarding: (A) specific searches and seizures, wire tapes or eavesdropping, (B) the acquisition of statements made by the defendant to a State agent that the State intends to use at a hearing or trial, and (C) pretrial identification of the defendant by a witness for the State.

(b) *Disclosure upon request.* Upon request of the defendant, the State's Attorney shall:

\* \* \*

(2) Statements of the defendant. As to all statements made by the defendant to a State agent that the State intends to use at a hearing or trial, furnish to the defendant, but not file unless the court so orders: (A) a copy of each written or recorded statement, and (B) the substance of each oral statement and a copy of all reports of each oral statement.

As we noted, the court found that appellant's statement was made to his mother. That finding was not clearly erroneous. And, a statement made to a non-state agent is not within the scope of Maryland Rule 4–263(b)(2). *See Jennings v. State,* 303 Md. 72, 82, 492 A.2d 295 (1985); *McDowell v. State,* 31 Md.App. 652, 663, 358 A.2d 624, *cert. denied,* 278 Md. 727 (1976); *Funderburk v. State,* 12 Md.App. 481, 490–91, 280 A.2d 4, *cert. denied,* 263 Md. 713 (1971)(involving post-crime remark to accomplice's mother); *Smith v. State,* 4 Md.App. 146, 153, 241 A.2d 728 (1968); *Boone v. State,* 3 Md.App. 11, 30, 237 A.2d 787, *cert. denied,* 393 U.S. 872, 89 S.Ct. 161, 21 L.Ed.2d 141 (1968).

■ Moreover, the trial court perceived the statement as an admission by Holland of his involvement in the burglary. The court did not err in finding that the statement was inculpatory. Indeed, we agree with the State that "Holland would have had a better argument that his statement was exculpatory if he had stated that he was not involved at all in the commission

of the crime rather than isolate certain conduct in the list of various acts which he believed he did not do."

■ "Evidence is considered material, and relief is therefore appropriate, if 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.'" *Ware v. State*, 348 Md. 19, 46, 702 A.2d 699 (1997) (citation omitted). The trial court was the fact finder, and its determination that Holland's statement was incriminatory does not undermine our confidence in the outcome of the case.

### III.

Before trial, appellant's counsel moved to suppress the physical evidence seized from appellant's residence as well as his statements to the police. Relying on *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), appellant argued that the affidavit in support of the search warrant, signed by PFC Conneely and Sgt. George W. Bacorn Jr., was "misleading," and the affiants intentionally or recklessly omitted key information. Specifically, appellant complained: (1) the affidavit did not disclose that Carter and Taylor were unable to see the suspect's full face because it was covered by the hood of his parka; (2) the affidavit did not reveal that neither Carter nor Taylor identified appellant as the assailant during a photo array; (3) the affiants falsely "stated that a positive identification of the defendant was made by a witness to the crime."

The court denied the suppression motion, and appellant now complains about that ruling. In appellant's view, the officers omitted the "crucial facts that the robbery suspect's face was not seen by the witnesses and that both witnesses failed to pick the defendant out of the photo arrays...." Further, he argues that if the disputed information had been included in the search warrant, it would not have established probable cause.

The court held an evidentiary motion hearing on July 10, 2002, at which appellant's counsel called PFC Conneely as his only witness. He also offered into evidence the affidavit and warrant application, as well as the officer's police report and an evidence inventory form of the items seized in the search. The State did not present any evidence.

In the affidavit, PFC Conneely and Sgt. Bacorn averred:

On March 3, 2002 at approximately 6:30 PM, your Affiant responded to the residence located at 105 North Fifth Street Denton, Caroline County, MD in reference to a reported Attempted Armed Robbery. Your Affiant spoke with the victim, William Carter, who stated that an unknown African American male had entered Carter's apartment, without knocking or being invited, displayed a black in color handgun and demanded money. Carter stated that his roommate, Edward Henry Taylor, exited the back bedroom of the apartment at which time the suspect fled the residence.

Carter described the suspect as an African American male, dark complexion, approximately five feet four inches tall, wearing a dark colored hooded parka having fur around the outside edge of the hood. Carter stated that he observed the suspect standing on the sidewalk at the corner of North Fifth Street and Gay Street just prior to the incident. Taylor confirmed all of the information that Carter provided.

Your Affiant is familiar with an African American male, Samuel Marcel Holland, from previous police contacts, the most recent being January 29, 2002. Holland closely resembles the physical description as given by Carter and Taylor. Your Affiant has observed, on numerous occasions, Holland wearing a coat similar to that described by Carter and Taylor.

On March 4, 2002 your Affiant again spoke with Taylor. Taylor advised that on the night of the incident he observed your Affiant speaking with a group of individuals on the front porch of 106 North Fifth Street, one of which was

Samuel Holland. Taylor further advised that the suspect was one of the individuals that your Affiant spoke with at 106 North Fifth Street. Taylor described the suspect as an African American male wearing all dark clothing. Your Affiant observed that no one on the porch was wearing all dark clothing except Samuel Holland.

Samuel Holland resides at 515 Lincoln Street Denton, Caroline County, MD. Your Affiant and your Co–Affiant, through their training knowledge and experience, know that perpetrators of the crime of Armed Robbery often conceal the weapons used in that robbery at their places of residence. Your Affiant and your Co–Affiant also know that clothing worn during such crimes is kept at the perpetrators [sic] residence.

PFC Conneely testified that he conducted the investigation of the attempted robbery of Carter, which began on March 3, 2002. He learned that the suspect was in the victim's apartment for a brief time. Mr. Carter told the officer that the suspect demanded money and showed Mr. Carter part of a gun, which Mr. Carter believed was real. The officer recalled that Mr. Carter described the suspect as an African–American male with a dark complexion, about "five (5) feet, four (4) inches tall and wearing a dark colored hooded parka with fur around the edge of the hood." Because the hood of the parka was up, the witness reported that the suspect's face was partially covered. Therefore, Carter said he only saw the upper part of the suspect's face, including his nose and eyes. No estimate of age or weight was provided. According to the officer, Taylor provided a similar description.

That night, PFC Conneely compiled a photo array which included appellant's photograph. The officer showed the photo array to both Mr. Carter and Mr. Taylor. He acknowledged that neither witness identified the assailant in the array.

After Conneely showed the photo array to Carter and Taylor, he spoke to appellant's mother, Ms. Robinson, and told her that her son had not been identified from the photo array.

The conversation with appellant's mother took place on the porch at 106 North Fifth Street. Other family members, including appellant, were present. At that time, Mr. Taylor saw the individuals on the porch, but the officer did not know that Mr. Taylor was watching.

PFC Conneely further testified that Mr. Taylor contacted Officer Franklin the next day, and PFC Conneely re-interviewed him. Taylor told the officer that the person standing on the far south part of the porch, wearing dark clothing, was the person who had attempted to rob Carter. Specifically, Taylor told the officer that "the guy who pulled the gun out was the guy on the porch with you [i.e., with Officer Conneely] that night wearing black." PFC Conneely identified that person as appellant, because he was the only individual wearing black. Moreover, the officer testified that the porch was approximately fifty feet from the residence of Mr. Carter and Mr. Taylor at 105 North Fifth Street.

The officer conceded that the case turned on identification. Yet, he acknowledged that the affidavit did not disclose that neither of the witnesses had seen the suspect's entire face, because the suspect's face was partially covered by the hood of his parka. Nor did it disclose that the witnesses failed to identify appellant in the photo array. The officer also acknowledged that the affidavit indicated that appellant was identified as the one who committed the robbery.

The following testimony is relevant:

[APPELLANT'S COUNSEL]: Now at that point, at this point, the case is a case of identification isn't it?

[PFC CONNEELY]: Yes.

[APPELLANT'S COUNSEL]: There's, they don't really see the face right?

[PFC CONNEELY]: Correct.

[APPELLANT'S COUNSEL]: You know, the identification is only by the type of clothing worn and they don't pick him out of the line up?

[PFC CONNEELY]: Correct.

[APPELLANT'S COUNSEL]: Now, but what you tell the Judge is you got a description, it matches, it generally matches Sam Holland and you tell the Judge that Mr. Taylor affirmatively pointed him out as the one who committed the robbery?

[PFC CONNEELY]: Yes.

* * *

[APPELLANT'S COUNSEL]: But you didn't tell the Judge that both Mr. Carter and Mr. Taylor failed to pick Sam Holland out of two photo arrays each?

[PFC CONNEELY]: No, that's not in the warrant, in the application.

[APPELLANT'S COUNSEL]: And you don't tell the Judge that this perpetrator, the suspect's face was covered up to the nose?

[PFC CONNEELY]: No, I don't see it anywhere in here.

[APPELLANT'S COUNSEL]: You don't tell him that the suspect had the hood of the parka up on his head at the time of the robbery? (Pause.)

* * *

[APPELLANT'S COUNSEL]: You didn't tell, you didn't tell ...

[PFC CONNEELY]: Correct.

[APPELLANT'S COUNSEL]: ... the Judge in your application that the suspect during the robbery had his hood on his hat?

[PFC CONNEELY]: Correct but there were two (2) positive I.D.'s.

[APPELLANT'S COUNSEL]: What's that?

[PFC CONNEELY]: I said there were two (2) positive identifications there.

[APPELLANT'S COUNSEL]: What do you mean by that?

[PFC CONNEELY]: One from Mr. Taylor and Mr. Carter when he was standing on the sidewalk and then the one on the porch.

[APPELLANT'S COUNSEL]: Okay, there ... go one by one. There were two separate positive I.D.'s?

[PFC CONNEELY]: Well, the main positive I.D., Mr. Taylor, the one on the porch.

[APPELLANT'S COUNSEL]: Okay ...

[PFC CONNEELY]: Okay (inaudible).

[APPELLANT'S COUNSEL]: What's the other one?

[PFC CONNEELY]: The suspect was seen twice, one [sic] before the incident and once after the incident the next day and all I have in there is prior to the incident.

[APPELLANT'S COUNSEL]: Okay but Mr. Carter didn't identify who he saw before the incident as Sam Holland?

[PFC CONNEELY]: No, no.

[APPELLANT'S COUNSEL]: And you also don't, you didn't tell [the issuing judge] that Mr. Taylor was fifty (50) feet away from, approximately fifty (50) feet away from Mr. Holland when he made that identification?

[PFC CONNEELY]: No.

Defense counsel also asked Conneely if the witnesses saw the suspect's face when "they saw the guy standing on the corner before the robbery." The officer answered that "they weren't specific to say they saw his face." Defense counsel then inquired why the officer indicated that the witnesses saw the suspect's face, when his report omitted that fact. Conneely responded that the witnesses must have seen the suspect's face "if they pointed the guy out as being the one...." The following colloquy ensued on re-direct examination:

[APPELLANT'S COUNSEL]: Okay and I asked you, well, was, did they see his face, you said I don't know, they didn't say one way or the other?

[PFC CONNEELY]: Right.

[APPELLANT'S COUNSEL]: Okay did they say one way or the other did they not, I mean let's lock this in, yes or no?

[PFC CONNEELY]: I don't recollect, it's not in my report that they did see his face, so they did not say . . .

[APPELLANT'S COUNSEL]: Did they say anything . . .

[PFC CONNEELY]: . . . from that point that they had seen his face when he was standing on the corner.

[APPELLANT'S COUNSEL]: They didn't say it?

[PFC CONNEELY]: No.

[APPELLANT'S COUNSEL]: Okay well then why when the prosecutor asked you, you know, the victim saw his face twice, you said yes, when did they see his face twice?

[PFC CONNEELY]: They must have seen it twice if they pointed the guy out as being the one, he saw it somewhere else before.

[APPELLANT'S COUNSEL]: Okay so one time is when he sees him on the porch?

[PFC CONNEELY]: Right.

[APPELLANT'S COUNSEL]: And he saw his face?

[PFC CONNEELY]: (No audible response.)

[APPELLANT'S COUNSEL]: And you're concluding that he must have seen the face one time prior to that?

[PFC CONNEELY]: The State's Attorney had asked me if he was seen prior to the incident and the answer is yes and that is in my report. Prior to the incident he was seen. Now I don't know if he actually saw his face but the suspect was seen before the incident.

[APPELLANT'S COUNSEL]: Okay so you don't know whether he saw his face, isn't the face a very important part of identifying somebody?

[PFC CONNEELY]: Yes.

[APPELLANT'S COUNSEL]: Okay and the way that he described the guy on the corner prior to the incident was that he was wearing a parka?

[PFC CONNEELY]: Yes.

[APPELLANT'S COUNSEL]: He didn't give any, they didn't indicate that they saw his face?

[PFC CONNEELY]: They didn't indicate one way or the other.

At the end of the testimony, appellant's attorney argued that PFC Conneely acted with reckless disregard by omitting from the affidavit facts relevant to the identification of the suspect:

Okay, the eyewitness I.D.'ed [appellant]. But the eyewitnesses apparently didn't see his face because it was half covered and then this, and then the hood covered the rest of his head. The eyewitness didn't pick him out of two photo arrays. Actually both I.D.'s, eyewitnesses. That he was standing a distance away from Mr. Holland when he did I.D. him. And when you haven't seen a person's face it's very difficult to I.D. someone and that I.D. by Mr. Taylor which is the basis of the probable cause, it doesn't rise to the level of probable cause given the rest of the facts that were not put in by the officers.

Denying appellant's suppression motion, the court reasoned: The contention by the Defendant in effect is that the State has to try their case up front, that they've got to convince a judge beyond a reasonable doubt up front that all the identifications are valid, that they will be able to prove the case beyond a reasonable doubt to the satisfaction of twelve people on a jury. Then they'll never get a search warrant and that simply is not the law, never has been. It is not uncommon at all for people who wore ski masks in robberies to be arrested on probable cause, similar situations as this or to have their houses searched. It is also not uncommon for people to be arrested based on videotapes which are not clear even to juries later on when you try the case right here in this courtroom or on televisions or anything else. You say, well, you know, the person ... that was robbed or in the video store or the undercover officer says this is the person right there, I saw it. Most courts and decisions I've ever seen said that's sufficient probable cause, eyewitness,

fingering, identification, whatever you want, is sufficient to get the ball rolling. It may not later be sufficient to prove beyond a reasonable doubt to that the person [sic] charged is in fact guilty and most of the points that [defense counsel] has made will certainly be presented, I am sure, when and if the case is tried.

So I'm not going to require police officers to also put in applications for statement of charges any exculpatory information they may have that ... let's suppose one of these people identified somebody else, how do we know that [the issuing judge] would have said, oh well, if that's the case, then obviously I'm not going to issue a search warrant. If I was a judge and they presented that to me, I would say, I'll tell you what you guys do, I'm signing this search warrant but I want you to go get another search warrant for the guy that they did identify and we'll search both houses and hopefully we won't find the same items in both places but we will find them in one and that will help prove who it is. Same way with fingerprints and other things like that. *You don't have to try your case up front, that's never been required.* It's a small town. I essentially would say to you this, if [the issuing judge] was here now and we gave him the police report and you said it's an application that he'd still issue the warrant. I would. *The fact that there's these exculpatory things in here doesn't mean that it's an unreasonable search of Mr. Holland's place to go in and look for these items,* some of which I guess they found. So that's the reason why the motion to suppress the items listed on Exhibit No. 1 is denied.

(Emphasis added).

The Warrant Clause of the Fourth Amendment of the United States Constitution, applicable to the states through the Fourteenth Amendment, *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), proscribes the issuance of any warrant "but upon probable cause, supported by Oath and affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. CONST. AMEND. IV. "Article 26 of the Maryland Constitu-

tion is *in pari materia* with the fourth amendment." *Birchead v. State*, 317 Md. 691, 700, 566 A.2d 488 (1989). To be sure, "[a] judicially authorized warrant is the cornerstone of the Fourth Amendment...." *Wiegmann v. State*, 118 Md. App. 317, 347, 702 A.2d 928 (1997), *aff'd*, 350 Md. 585, 714 A.2d 841 (1998).

Accordingly, absent certain exceptions not applicable here, the police must obtain a search warrant before conducting a search; that warrant must be based upon "sufficient probable cause to justify its issuance as to each person or place named therein." *State v. Ward*, 350 Md. 372, 387, 712 A.2d 534 (1998) (citation omitted); *see Connelly v. State*, 322 Md. 719, 726, 589 A.2d 958 (1991). Probable cause is defined as a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *see State v. Lee*, 330 Md. 320, 326, 624 A.2d 492 (1993).

"Probable cause to support the issuance of a warrant involves 'less than certainty of proof, but more than suspicion or possibility.'" *Yeagy v. State*, 63 Md.App. 1, 11, 491 A.2d 1199 (1985) (citations omitted). The totality of the circumstances is relevant in a probable cause assessment. *Collins v. State*, 322 Md. 675, 680, 589 A.2d 479 (1991); *State v. Lemmon*, 318 Md. 365, 379, 568 A.2d 48 (1990). Moreover, both the Supreme Court and the Court of Appeals have adhered to a practical, nontechnical approach in analyzing probable cause, and have long recognized that common sense must guide a judge who is asked to issue a warrant. *See United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *Valdez v. State*, 300 Md. 160, 169, 476 A.2d 1162 (1984).

In the seminal case of *Illinois v. Gates, supra,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527, the Supreme Court reiterated that "the central teaching of [its] decisions bearing on the probable-cause standard is that it is a 'practical, nontechnical conception.'" *Id.* at 231, 103 S.Ct. 2317 (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). Thus, the issuing judge is

simply [making] a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Gates*, 462 U.S. at 238, 103 S.Ct. 2317.

In assessing probable cause for the issuance of a warrant, a reviewing court is ordinarily confined to the averments contained in the four corners of an affidavit. *See Birchead*, 317 Md. at 700, 566 A.2d 488; *Wilson v. State*, 132 Md.App. 510, 533–34, 752 A.2d 1250 (2000). And, an affidavit underlying a search warrant is presumptively valid. *Franks*, 438 U.S. at 171, 98 S.Ct. 2674; *Edwards v. State*, 350 Md. 433, 450, 713 A.2d 342 (1998); *Dashiell v. State*, 143 Md.App. 134, 149, 792 A.2d 1185 (2002)("facts included in the application for the search warrant are deemed credible, reliable, and trustworthy"), *aff'd*, 374 Md. 85, 821 A.2d 372 (2003); *Rosenberg v. State*, 129 Md.App. 221, 244, 741 A.2d 533 (1999), *cert. denied*, 358 Md. 382, 749 A.2d 173 (2000). In *Thompson v. State*, 139 Md.App. 501, 534, 776 A.2d 99 (2001), this Court reiterated:

> Our standard for review of an issuing judge's probable cause determination is that so long as the issuing judge had "a substantial basis for concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *West v. State*, 137 Md.App. 314, 322, 768 A.2d 150 . . . (2001). We said in *West* that "[r]eviewing courts (at the suppression hearing level or at the appellate level) do not undertake *de novo* review of the magistrate's probable cause determination but, rather, pay 'great deference' to that determination" (quoting *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 . . . (1983)).

To effectuate the preference for warrants, great deference is accorded to the issuing judge's determination. *Gates*, 462 U.S. at 236, 103 S.Ct. 2317; *see McDonald v. State*, 347 Md. 452, 467, 701 A.2d 675 (1997), *cert. denied*, 522 U.S. 1151, 118 S.Ct. 1173, 140 L.Ed.2d 182 (1998); *Connelly*, 322 Md. at 727,

589 A.2d 958; *Birchead, 317 Md.* at 701, 566 A.2d 488. But, wholly conclusory statements in a warrant application ordinarily will not suffice. *See Gates,* 462 U.S. at 239, 103 S.Ct. 2317 (citing *Nathanson v. United States,* 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933) and *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964)). Moreover, the issuing judge should not function as a mere " 'rubber stamp for the police.' " *Grimm v. State,* 7 Md.App. 491, 493, 256 A.2d 333 (1969)(quoting *Aguilar,* 378 U.S. at 112, 84 S.Ct. 1509). To the contrary, there are limits "beyond which a magistrate may not venture in issuing a warrant", *Gates,* 462 U.S. at 239, 103 S.Ct. 2317, and "[d]eference to the magistrate ... is not boundless." *United States v. Leon,* 468 U.S. 897, 914, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

The judge's task is " 'to make a practical common-sense decision whether probable cause exists.' " *McDonald,* 347 Md. at 467, 701 A.2d 675 (quoting *Birchead,* 317 Md. at 701, 566 A.2d 488). This means that we must determine if the judge who issued the search warrant had "a substantial basis for concluding that the evidence sought would be discovered in the place described in the application and its affidavit." *Lee,* 330 Md. at 326, 624 A.2d 492; *see Massachusetts v. Upton,* 466 U.S. 727, 728, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984) (reiterating that "the task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue a warrant"); *McDonald,* 347 Md. at 467, 701 A.2d 675; *Birchead,* 317 Md. at 701, 566 A.2d 488.

As we noted, appellant's challenge rests on *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In that case, the Supreme Court carved out an exception to the "four corners" review of a warrant application. It said:

[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false

statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the fact of the affidavit.

*Franks*, 438 U.S. at 155–56, 98 S.Ct. 2674. *Franks* applies to omissions as well as misstatements. *Wilson v. State*, 87 Md.App. 659, 667, 591 A.2d 524, *cert. denied*, 324 Md. 325, 597 A.2d 422 (1991); *Yeagy*, 63 Md.App. at 8, 491 A.2d 1199.

In *McDonald v. State, supra*, 347 Md. at 471–72 n. 11, 701 A.2d 675, the Court of Appeals elucidated the process that attends a *Franks* hearing. It explained:

In fact, *Franks v. Delaware* set out a procedure, requiring a detailed proffer from the defense before the defendant is even entitled to a hearing to go behind the four corners of the warrant. Under *Franks*, when a defendant makes a substantial preliminary showing that the affiant intentionally or recklessly included false statements in the supporting affidavit for a search warrant, and that the affidavit without the false statement is insufficient to support a finding of probable cause, the defendant is then entitled to a hearing on the matter. The burden is on the defendant to establish knowing or reckless falsity by a preponderance of the evidence before the evidence will be suppressed. Negligence or innocent mistake resulting in false statements in the affidavit is not sufficient to establish the defendant's burden. *Id.* at 171–72, 98 S.Ct. at 2684–85 . . . .

More recently, Judge Moylan, writing for this Court in *Fitzgerald v. State*, 153 Md.App. 601, 638–39, 837 A.2d 989 (2003), reiterated that Maryland has steadfastly adhered to the "four corners" doctrine. *Id.* at 638–39, 837 A.2d 989. Therefore, under *Franks*, a defendant must make "a threshold

showing that a governmental affiant has perjured himself on a material matter. . . ." *Id.* at 638, 837 A.2d 989. And, unless that threshold showing is met, "there will be no witnesses called." *Id.*

Accordingly, to challenge a misstatement or an omission in an affidavit based on *Franks,* the accused must make a substantial "preliminary showing," by a preponderance of evidence, that the alleged omission was made intentionally or with reckless disregard for accuracy. A showing of negligent or innocent mistakes will not suffice. *Connelly v. State,* 322 Md. 719, 727, 589 A.2d 958 (1991); *Yeagy,* 63 Md.App. at 8, 491 A.2d 1199. Rather, the omissions or misstatements must be material. As the *Yeagy* Court said, " '[a] magistrate cannot adequately determine the existence of probable cause with the requisite judicial neutrality and independence if the police provide him or her with a false, misleading, or partial statement of the relevant facts . . . but we will not invalidate a search warrant unless the omissions were material.' " *Yeagy,* 63 Md.App. at 8, 491 A.2d 1199 (citation omitted).

Only when this threshold burden is met by the defendant does the court conduct an evidentiary taint hearing. It must determine whether probable cause would exist based on the affidavit if the information improperly included were excised or, conversely, whether probable cause remains if the omitted information were deemed included. If probable cause would no longer exist, then the search warrant will be invalidated and the evidence obtained pursuant to the warrant will be suppressed. *Franks,* 438 U.S. at 156, 98 S.Ct. 2674.

In this case, the motion court proceeded to the taint hearing. Accordingly, appellant obtained the relief contemplated by *Franks;* he was not confined to the four corners of the affidavit in arguing that the affidavit did not establish probable cause. Upon hearing the evidence, the trial court disagreed that the affiants made deliberate or reckless material omissions in the affidavit. Moreover, and significantly, even if the disputed information had been included, the court was of

the view that there was probable cause to issue the search warrant. We agree.

Although the affiants omitted information that certainly was relevant at trial, and the affiants could have been more forthcoming in regard to their affidavit, the court was entitled to conclude that the affiants did not purposefully act to mislead the issuing judge, nor did they act with reckless disregard in omitting the information from the affidavit. Conneely testified that he merely included information he believed to be relevant to a finding of probable cause for the search warrant, but did not deliberately omit damaging information in the affidavit. More important, even if the disputed information had been included, the court was quite satisfied that the affidavit would have established probable cause. We perceive no error in regard to that finding.

**JUDGMENT OF THE CIRCUIT COURT FOR CARO-LINE COUNTY REVERSED AS TO THE BURGLARY CONVICTION BUT AFFIRMED IN ALL OTHER RE-SPECTS. COSTS TO BE PAID ONE HALF BY APPEL-LANT AND ONE HALF BY CAROLINE COUNTY.**