864 A.2d 1037

**Russell Wayne WAGNER**

v.

**STATE of Maryland.**

**No. 2034, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

Jan. 3, 2005.

534

Stacy W. McCormack (Stephen E. Harris, Public Defender on the brief), Baltimore, for Appellant.

Shannon E. Avery (J. Joseph Curran, Jr., Atty. Gen. on the brief), Baltimore, for Appellees.

Panel: MURPHY, C.J., THEODORE G. BLOOM, (Retired, specially assigned), STEPHEN P. JOHNSON, (Specially assigned), JJ.

MURPHY, Chief Judge.

In the Circuit Court for Washington County, a jury (Hon. Fred C. Wright, presiding) convicted Russell Wayne Wagner, appellant, of two counts of first degree premeditated murder, two counts of first degree felony murder, and one count of burglary.[1] Appellant now presents four questions for our review:

---

1. Appellant was sentenced to three consecutive sentences of life imprisonment: one for the premeditated murder of Daniel Davis, one for the

I. DID THE TRIAL COURT ERR IN ADMITTING MITOCHONDRIAL DNA EVIDENCE LINKING APPELLANT TO A GLOVE FOUND NEAR THE CRIME SCENE?

II. DID THE TRIAL COURT ERR WHEN, IN RESPONSE TO A QUESTION FROM THE JURY, IT ENGAGED IN A DISCUSSION WITH DEFENSE COUNSEL IN FRONT OF THE JURY, REGARDING THE COURT'S WILLINGNESS TO ALLOW MEMBERS OF THE JURY TO COME TO COURT EARLY TO LOOK AT THE EXHIBITS?

III. WAS THE EVIDENCE LEGALLY INSUFFICIENT TO SUSTAIN APPELLANT'S CONVICTIONS?

IV. DID THE TRIAL COURT ERR IN IMPOSING A LIFE SENTENCE FOR APPELLANT'S CONVICTION OF FIRST DEGREE FELONY MURDER OF WILDA DAVIS GIVEN THAT APPELLANT WAS ALSO SENTENCED TO A LIFE SENTENCE FOR THE PREMEDITATED MURDER OF WILDA DAVIS?

We answer "no" to questions I, II and III, and "yes" to question IV. We shall therefore vacate the sentences imposed on the felony murder convictions, but otherwise affirm the judgments of the circuit court.

## Background

On February 15, 1994, Daniel and Wilda Davis were found dead in their home on West Wilson Boulevard in Hagerstown. The victims had been bound at their wrists and ankles and had been stabbed multiple times in the chest and back.[2]

---

premeditated murder of Wilda Davis, and one for the felony murder of Wilda Davis. The trial court further imposed a concurrent sentence of life imprisonment for the felony murder of Daniel Davis and a concurrent sentence of twenty years imprisonment for burglary.

**2.** The doctor who performed the autopsy testified that Mr. Davis was stabbed nine times in the chest and six times in the back. Mrs. Davis was stabbed five times in the chest and four times in the back.

On February 16, 1994, the victim's neighbor, Phyllis Carpenter, informed the police that during the morning of February 15, 1994, she discovered a work glove along the curb on a street near her home and had placed it on her back porch, intending to throw it away. Upon learning of the murders, however, she contacted the police.[3] The glove was recovered from Carpenter's porch on the afternoon of February 16, 1994. That same day, investigating officers recovered a knife from a snowbank after another concerned citizen, Bobby Burnett, informed them that he saw what appeared to be a bloody knife in a snowbank near the front of his house.[4]

Detective William Rourke recovered the knife, and noticed blood on the blade. He also recovered the glove from Ms. Carpenter's back porch. Both the glove and the knife were sent to the FBI laboratory for processing. A single strand of hair was discovered on the glove, along with stains of blood that matched Mr. Davis' blood type. In 1996, appellant was charged with the murders of Mr. and Mrs. Davis. Appellant's first trial ended in a mistrial when the jury was unable to reach a verdict. During that trial, there was no physical or scientific evidence linking appellant to the scene of the crime. After the conclusion of that trial, however, mitochondrial DNA (mtDNA) testing was performed on a single strand of hair recovered from the glove found by Ms. Carpenter. During the retrial that resulted in the verdicts at issue in this appeal, the jury was entitled to accept all, part, or none of the State's evidence, which included the following testimony.

---

**3.** In February, 1994, Phyllis Carpenter lived at 5 Garrett Street in Hagerstown. She was returning home from the grocery store between 8:30 and 9:00 a.m. on February 15, 1994 when she saw a glove near the curb outside of her house. She picked up the glove and placed it on her back porch, intending to throw it in the trash later. On the morning of February 16, 1994, after learning about the murders and talking with her son, she decided to call the police.

**4.** In 1994, Bobby Burnett lived at 812 Maryland Avenue in Hagerstown. On February 17, 1994, he was walking along Spruce Street to pick up his children from the babysitter when he noticed the handle of a knife sticking out of the snow. He kicked it, but did not otherwise touch it.

Dr. John Stewart, an expert in forensics, testified as to the scientific probability that appellant was the contributor of that genetic material, i.e. the hair. The victims' son, Vernon Davis, testified as follows. His parents kept a very clean house, ate supper early, and prepared for bed around 7:00 p.m. every night. They owned two rental properties for which they received rent payments in cash. They kept the cash in their home, and used their bank account to deposit their Social Security checks. After his parents were murdered, he and his two sisters, Vivian Monger and Virginia Davis, each inherited between $50,000.00 and $60,000.00.

Vivian Monger, the victim's daughter, testified as follows. She talked to her mother on the phone every day and saw her once a week. On February 14, 1994, when talking to her mother on the phone, she mentioned that her husband, Ted Monger, would come by to pick up some potato salad that evening. At 7:10 p.m., Ted arrived home without the potato salad. Vivian called her mother back to let her know that he had forgotten to stop by, but there was no answer.

Virginia Davis, the last of the victims' children to speak to their mother, testified as follows. She called her parents a little after 7:00 p.m. to ask how their Valentine's Day had been. While she was on the phone with her mother, someone arrived at her parents' door. Mrs. Davis said, "Someone's at the door," at which time she put the telephone down. Virginia heard some talking, but could not make out what was said, except that she could hear her father's voice, which was sometimes loud because he had hearing problems. Virginia heard her father say, "I know what you want. You want gas." Mrs. Davis then came back to the telephone and told her daughter she would "talk to her later." During this conversation, Virginia did not detect concern or alarm in her mother's voice.

Lisa Smith, Virginia's granddaughter and the papergirl in the Davises' neighborhood, stopped at her great grandparents' house every day around 3:00 p.m. to deliver the newspaper.

When she came by on February 15, 1994, she discovered their bodies and observed that their house was a mess.

Tina Robinette, who rented a small house from the Davises directly behind their house, testified that the Davises were like parents to her, that she paid her rent in cash, that Ted Monger occasionally did repairs for the Davises and that, on one occasion prior to the murder, appellant accompanied Ted when he came to fix her sink. She also testified that on another occasion, she saw Ted and appellant coming out of the Davises' backdoor.

Dr. Jeffrey Kercheval, a forensic scientist for the Hagerstown Police Department, testified as follows. When he arrived at the crime scene on February 15, 1994, the house was in disarray and the drawers were pulled out of the dressers. Pillowcases were missing from the pillows in the upstairs bedrooms. Mrs. Davis' empty wallet was sitting out on the kitchen table. There was also an empty bank envelope on the table. There was no paper currency found anywhere in the house. His investigation revealed that it would take approximately eight minutes to walk from the victims' house at 109 West Wilson Boulevard to 610 Chestnut Avenue, appellant's residence at the time of the murders. He later collected hair and blood samples from appellant and from everyone else who came in contact with the crime scene or with the evidence recovered from the scene.

On February 18, 1994, Detective Rourke went to the Big Lots store at the South End Shopping Center in Hagerstown, and purchased gloves that matched the glove recovered from Ms. Carpenter. From the store receipts provided by Big Lots, he determined that a pair of the same type of gloves had been purchased at 5:05 p.m. on February 14, 1994.

Wayne Albright, a friend and coworker of appellant's, testified as follows. On February 14, 1994, he drove appellant to Big Lots after they got off from work. Appellant told Albright that he wanted to buy gloves for work. Prior to the murders, the knife recovered from Ms. Carpenter's porch had been in appellant's apartment. Appellant told him that Ted

Monger, appellant's landlord at 610 Chestnut Avenue, and another man, had asked appellant to do "something," but appellant did not specify what they had asked him to do. Prior to the murders, appellant never seemed to have any money.

Albright's wife, Dawn, testified as follows. She had become friendly with appellant through her husband. She cashed appellant's checks for him because he did not have a bank account. In 2001, when appellant was incarcerated, she had a telephone conversation with him, during which (1) she asked him why he was taking the fall for others who committed the Davis murders, and (2) appellant told her that Billy Hassenbuhler, another of Monger's tenants, committed the murders while appellant was upstairs looking for money.

Karen Powell Minnich, a friend of appellant's in 1994, who also knew Ted Monger, Billy Hassenbuhler, and Chuck Harmon (an employee of Monger), testified as follows. She was "down and out" during that period of her life, and she "hung out" with the people who rented apartments from Monger at 610 Chestnut Avenue. On several occasions prior to the murders, appellant told her that Monger and Harmon wanted him to do something for them, but appellant did not specify what. She recalled that, in an earlier statement to the police, she stated that appellant told her that Monger was going to pay him to rob some older people.

On February 14, 1994, Minnich and her friend, Cathy, met appellant at the Off Square Lounge in Hagerstown. On this occasion, appellant appeared to be "stressed out." Although he usually bought beer using change, that night he had cash and bought beer for the three of them over the course of two hours. During the evening, appellant told Minnich "everything was taken care of . . . I don't have to worry about money anymore. . . .[,] I don't have to worry about rent anymore . . . and Ted's taking care of it." A few days later, appellant told Minnich that he expected that they would try to pin the murders on him.

Robert Keedy testified as follows. He met appellant in a tavern in Hagerstown in 1997, and that on one occasion, appellant told Keedy that he had nothing to do with the murders, but that he had been upstairs "ransacking" and looking for money. Michael Crouse testified that he shared a jail cell with appellant in August, 1997, at which time appellant told him that he had beaten a murder rap four and half years earlier. According to Crouse, appellant admitted that he had tied up the victims, put pillowcases over their heads, and stabbed them.

As stated, appellant was convicted of the first degree premeditated murders of Mr. and Mrs. Davis, first degree felony murder of each victim, and burglary.

## Discussion

### I

Prior to trial, defense counsel filed several motions to exclude the mtDNA evidence. At the conclusion of the hearings on those motions, Judge Wright delivered an oral opinion that included the following findings and conclusions:

Science evolves. Certainty and perfection are elusive. Even in this testing procedure of mitochondrial DNA, it is not a perfect identification process. We know that the final result of mitochondrial DNA typing analysis is that a defendant is either excluded as a possible contributor of the genetic material, or he is included within a class of possible contributors. So there is uncertainty as to inclusion, because it is inclusion within a possible, a class of possible contributors.

Evidence is to be allowed to be considered by a trier of fact that is reliable to the extent that it has evidentiary value. The court ... acts to keep away from jury consideration any evidence that the court finds is of no evidentiary value, because it is, maybe, prejudicial to the point that it may affect the juror, but it is not connected to the case.... [I]t is a goal in criminal matters to make certain that the evidence is of such a nature, that if believed, a person is to

be found guilty only if that evidence shows guilt beyond a reasonable doubt, not to perfection. . . .

This whole analysis of the process by which the hair was found and eventually is analyzed is to be analyzed by the court to make certain whatever imperfection there may have been, that imperfection does not destroy the reliability, or the integrity, or the evidentiary value of the evidence itself. So, yes, there's imperfection in this chain of custody. Yes, there's, perhaps, imperfection in the procedure of analysis. But it is not . . . imperfection that destroys the reliability and the evidentiary value of either the opinion of the analyst, or the evidence itself.

Having said that, this court finds that the evidence [ ] has . . . establish[ed] that the mitochondrial DNA . . . procedure of analysis and interpretation used in this case, as well as generally used, have reached generally accepted reliability in the scientific community. . . . [I]n the scientific community of the study of evolution, biology, forensics, all of the scientific communities that deal with identification in some nature have generally accepted this steady process of extraction, amplification, PCR amplification, and sequencing. So the procedure is, is accepted, and, and passes the *Frye/ Reed* analysis that this court must do.

\* \* \*

[T]he opinion, basically, comes down [ ] to the extent that the defendant could have been the donor of the hair because he falls within a particular class. Now that is not perfection; that is not identification, but it is a . . . generally accepted, scientifically accepted method, opinion. [D]r. Stewart's reaching that opinion, was based on generally accepted procedures, which the jury can certainly consider together with any types of examination which would indicate that it is not to be given much value. The weight, it's a question of weight. As far as I'm concerned it's a question of admissibility, and I would deny the motion to exclude.

Appellant argues that Judge Wright should have excluded the mitochondrial DNA (mtDNA) evidence linking appellant to the glove found near the crime scene. According to appellant, due to recent developments in the scientific community regarding issues of (1) mtDNA heteroplasmy, and (2) laboratory contamination, mtDNA test results are inadmissible under the *Frye–Reed* standard. Appellant also argues that "gaps" in the chain of custody and possible "contamination" of the glove rendered the test results unreliable. We are persuaded, however, that Judge Wright neither erred nor abused his discretion in overruling appellant's objections.

## The Admissibility of MtDNA Evidence

DNA is found in mitochondria, which are little organelles floating in the cytoplasm surrounding the nucleus of a cell.[5] The mtDNA is a double helix structure, the exact same structure as nuclear DNA.[6] The mtDNA molecules, however, are in the shape of a circle as opposed to a long twisted ladder, and the double helix structure is much smaller in mtDNA than in nuclear DNA.[7] As with nuclear DNA, if the double helix structure of the mtDNA is stretched out, the exact order of

---

**5.** Accordingly, mtDNA analysis can be used on material without a nucleus, such as a bone sample or a piece of hair without a root segment. It can also be used on unknown samples degraded by environmental factors or time. *United States v. Coleman,* 202 F.Supp.2d 962, 965 (E.D.Mo.2002). MtDNA is also more likely to survive in a dead cell than is nuclear DNA. *People v. Holtzer,* 255 Mich.App. 478, 660 N.W.2d 405, 408 (2003).

**6.** Nuclear DNA is found in the structure of a double helix, or a "twisted ladder of chemicals." *United States v. Coleman,* 202 F.Supp.2d 962 (E.D.Mo.2002). The "rungs" of the ladder are composed of four chemical bases known as nucleotides: adenine, cytosine, thymine, and guanine. The chemical bases are generally referred to as A, D, T, and G, respectively. An A is always paired with a T, and a C is always paired with a G on opposite "rails" of the ladder. *Id.* at 965. The order of the chemical bases is what provides the informational content of the DNA. *Id.* Everyone's nuclear DNA can be considered unique, with the exception of identical twins. *Id.*

**7.** In nuclear DNA, there are three billion base pairs of nucleotides, where in the smaller, circular mtDNA, there are only approximately sixteen and a half thousand nucleotide bases.

As, Ts, Cs, and Gs in the mtDNA molecules of one person can be determined.

Although the steps involved in laboratory analysis of mtDNA are exactly the same as those used for nuclear DNA analysis,[8]

> [t]he comparison process for mitochondrial DNA analysis involves two areas of the mitochondrial DNA structure, referred to as HV1 and HV2. These areas, referred to as the control region, are comprised of 1100 nucleotide bases and demonstrate high levels of sequencing variation among different individuals. It is very unlikely that any two people will have the same order of their ATCGs in the control region of mtDNA. However, it is not a unique identifier, because any other person in the same maternal lineage will have the same type.
>
> In mitochondrial DNA analysis, the sequence of the known and unknown samples are lined-up next to each other and compared.

*United States v. Coleman,* 202 F.Supp.2d 962, 966 (E.D.Mo. 2002).

MtDNA analysis provides significantly less ability to discriminate among possible donors than does nuclear DNA analysis and has been said to be a test more of exclusion than of identification. *State v. Scott,* 33 S.W.3d 746, 756–57 (Tenn. 2000).[9] The FBI laboratory implemented mtDNA analysis for

---

8. The DNA is extracted, purified, amplified, and sequenced.

9. The available database of mtDNA sequences, to which mtDNA profiles are compared to identify whether a particular profile commonly occurs within the population, is relatively small when compared to the database compiled for nuclear DNA profiles. *Scott,* 33 S.W.3d at 757. In order to tell how rare a mtDNA sequence is, scientists create a database of known DNA sequences from random samples of volunteers and determine how often any one particular sequence appears. *Adams v. State,* 794 So.2d 1049, 1061 (Miss.App.2001). This provides them with an idea as to how rarely or how frequently one would expect to see that sequence. *Id.* If there is a match, the matching sequence is then compared to profiles in the database to determine whether the sequence appears in the database. *Magaletti v. State,* 847 So.2d 523, 527 (Fla.Dist.Ct.App.2003). Because mtDNA is maternally inherited and

forensic purposes in 1996. *State v. Underwood*, 134 N.C.App. 533, 518 S.E.2d 231, 238 (1999). Appellate courts in at least ten states and one federal district court have held that the results of an mtDNA analysis are admissible.[10] The admissibility of mtDNA evidence has never been considered by a

because all matrilineal decedents will share the same mtDNA, the traditional random match probability used in nuclear DNA analysis cannot be calculated. *Id.* Instead, the counting method is used, and a ninety-five percent confidence interval is applied. *Id.* If the matching sequence derived from the mtDNA analysis is not found in the FBI database, an exclusionary rate is calculated to say that "X" percent of the population may be excluded as potential donors of the unknown sample. *Id.* In 2002, the FBI's mtDNA Population Database contained more than 4800 sequences. *See* mtDNA Population Database 1.2 Release Notes, *available at* www.fbi.gov/hq/lab/fsc/backissu/april2002/mtDNAreleasenotes.pdf.

10. *See State v. Council*, 335 S.C. 1, 515 S.E.2d 508, 518 (1999) (concluding trial judge was within his discretion in admitting the mtDNA analysis because the evidence was of assistance of the jury, expert witness was qualified, and underlying science was reliable); *State v. Underwood*, 134 N.C.App. 533, 518 S.E.2d 231, 240 (1999) (holding mtDNA testing sufficiently reliable to warrant its admissibility into evidence); *State v. Scott*, 33 S.W.3d 746, 756 (Tenn.2000) (holding trial court properly admitted evidence of mtDNA analysis without first holding a hearing to establish reliability); *Adams v. State*, 794 So.2d 1049, 1064 (Miss.App.2001) (holding science of mtDNA sequencing adequately proven at trial); *State v. Pappas*, 256 Conn. 854, 776 A.2d 1091, 1110 (2001) (finding no error in admitting mtDNA evidence); *People v. Holtzer*, 255 Mich.App. 478, 660 N.W.2d 405, 411 (2003) (holding use of mtDNA for identification of defendant admissible under test for novel scientific evidence); *Magaletti v. State*, 847 So.2d 523, 528 (Fla.Dist.Ct.App.2003) (holding use of mtDNA analysis to prove identity satisfied *Frye* test for admissibility of new or novel scientific evidence); *People v. Ko*, 304 A.D.2d 451, 757 N.Y.S.2d 561, 563 (2003) (upholding trial court's admission of mtDNA evidence). MtDNA evidence was found reliable and helpful to the jury by a New York trial court in *People v. Klinger*, 185 Misc.2d 574, 713 N.Y.S.2d 823 (N.Y.Co.Ct. Sep.05, 2000). MtDNA evidence also has been admitted in federal court. *United States v. Coleman*, 202 F.Supp.2d 962, 970–71 (E.D.Mo. 2002) (denying defendant's motion to exclude expert testimony based on mtDNA analysis and holding that (1) mtDNA analysis constituted scientific knowledge, was reliable, and would be helpful to the jury, and (2) any prejudicial effect of evidence based on mtDNA analysis was outweighed by its probative value). Admission of mtDNA evidence also has been upheld in several appellate opinions not designated for publication. *State v. Smith*, 100 Wash.App. 1064, 2000 WL 688180 (Wash. Ct.App.2000); *State v. Ware*, 1999 WL 233592 (Tenn.Crim.App.1999); *Sheckells v. Texas*, 2001 WL 1178828 (Tex.Ct.App.2001).

Maryland appellate court.[11]

"Novel scientific evidence may become admissible in one of several ways. First, the evidence may be admitted by statute, if a relevant statute exists. Second, the proponent can prove that the evidence meets the *Reed* standard of general acceptance in the relevant scientific community." *Armstead v. State*, 342 Md. 38, 54, 673 A.2d 221 (1996) (citations omitted). Before expert testimony can be based on the application of new scientific techniques, it must be established that the particular scientific method used is reliable. *Reed v. State*, 283 Md. 374, 380, 391 A.2d 364 (1978) (adopting the standard set forth in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923)). "[I]t is necessary that the reliability be demonstrated before testimony based on the technique can be introduced into evidence." *Id.* The proper test for establishing the reliability of scientific opinions is whether the basis of the opinion is generally accepted as reliable within the expert's particular scientific field. *Id.* at 381, 391 A.2d 364. Appellate courts apply a *de novo* standard when reviewing the trial court's *Frye–Reed* issues. *Wilson v. State*, 370 Md. 191, 201, 803 A.2d 1034 (2002).

During the hearings and at trial, Dr. Stewart was accepted, without objection, as an expert in forensic mtDNA analysis. He is the Program Manager of the FBI's National Missing Person DNA Database, and an examiner in the FBI's DNA Analysis Unit II, and testified as follows. If the same letter is found at each position on both the known person's sample and the unknown person's sample, the known person cannot be excluded from contributing the unknown sample. If there are

---

11. Courts and Judicial Proceedings Article, § 10–915 of the Maryland Code precludes generalized challenges to the admissibility of DNA evidence, except for constitutional challenges. *Armstead*, 342 Md. at 66, 673 A.2d 221. MtDNA evidence has only recently come into general use in the forensic field; therefore, we do not think the legislature contemplated the blanket admission of new types of DNA without the evidence and process from which it is derived being subject to a *Frye–Reed* inquiry. *See State v. Gross*, 134 Md.App. 528, 760 A.2d 725 (2000) (holding that DNA PCR evidence not covered by statute and requiring the evidence be subjected to the inquiry outlined in *Reed* ).

two or more letters that are different, however, then an individual can be excluded. "So if they have the same [letters] at each position it's a match; two or more . . . letters that are different, that's exclusion; one letter difference is inconclusive." If an individual cannot be excluded, the final step is to determine how common the sequence is by looking at a database of mtDNA profiles to see how many times that sequence shows up in the database.

During the motions hearings, Dr. Stewart testified that mtDNA evidence has. been entered into evidence at trial a total of approximately fifty times, in twenty-five states. He also submitted numerous peer review articles that demonstrate the general acceptance of mtDNA evidence, none of which rejected mtDNA analysis as unreliable. Even the defense's expert, Dr. Jeffrey Boore, did not controvert the proposition that the process of mtDNA extraction, amplification, and sequencing is generally accepted as reliable.

At trial, Dr. Stewart testified that all of the sites in the mtDNA obtained from the hair on the glove matched the sites from appellant's mtDNA. "The profile from [appellant], his mitochondrial DNA profile did not have differences from the mitochondrial profile from the [hair found on the] glove at those positions. Therefore, appellant cannot be excluded as the source of that hair." Most important, Dr. Stewart testified that, when he compared appellant's profile to the 5,071 profiles in the FBI's database at the time, he found eleven individuals in the profile that had the same mtDNA profile.

### Appellant's "Contamination" Argument

[5] Appellant argues that the danger of laboratory contamination makes mtDNA unreliable and thus inadmissible. An important shortcoming of mtDNA analysis is the sensitivity of the material, which renders it particularly susceptible to contamination. *Scott,* 33 S.W.3d at 757. This has resulted in heightened contamination controls in labs that analyze mtDNA evidence. *Id.* at 759. In *State v. Pappas,* 256 Conn. 854, 776 A.2d 1091 (2001), the Supreme Court of Connecticut held that the potential for contamination certainly affects the

weight of mtDNA evidence, but does not automatically render mtDNA evidence inadmissible. *Id.* at 1108. We agree with that holding.

Dr. Stewart testified that, based on published literature on the subject, as well as on his own experience, the danger of laboratory contamination does not render mtDNA testing unreliable. He explained the FBI laboratory has a strict contamination abatement program in place within the laboratory. That program involves sterilization of space, using bleach solution, ultraviolet light, gloves, masks, and lab coats, and restriction of movement of personnel from one area to the other. All of these precautions would have been taken in the analysis of the specific mtDNA evidence at issue. The defense's expert, Dr. Jeffrey Boore, testified that the FBI's method of guarding against contamination is better able to detect lower levels of contamination than the method used by his own lab, and added that "it's admirable that they go to such lengths to validate that they have not contaminated their sample."

> With respect to contamination, Judge Wright stated:
> There's reasonable probability that there was no tampering, or other contamination which occurred, either in the handling or the testing, which destroyed the reliability or the integrity of the process, or the reliability or the integrity of the evidence itself. So that the opinion that will be offered by the State that Mr. Wagner cannot be excluded as the donor of the [ ] hair can be of value to the jury, would be of value to the jury.

We agree with that conclusion.

### Appellant's "Heteroplasmy" Argument

■ Appellant also claims that mtDNA evidence is unreliable because of the existence of heteroplasmy.[12] Dr. Stewart

---

12. MtDNA from an individual can be heteroplasmic, meaning the DNA within a single cell can differ at one or more base pairs. The human body contains trillions of cells, each of which can contain hundreds to thousands of copies of mtDNA. A complete homoplasmy (the same

testified that the term heteroplasmy means that you have at least more than one exact type of mtDNA in the same individual. Heteroplasmy can present difficulties for forensic investigators because, if a mtDNA sample of the perpetrator differs by one base pair from the suspect's mtDNA sample, this difference may be interpreted as sufficient to "eliminate" the suspect.

There are two types of heteroplasmy that are present in the same individual: point and length. According to Dr. Stewart, point heteroplasmy exists when, at one "address" on the person's mtDNA strand, some mitochondria have, "say, a C," while others have, "say, a T." Length heteroplasmy exists when, for instance, there is a consecutive "run" of a particular letter, "say, seven Cs" at one position in a person's mitochondrion, and there is a different number, "say, eight Cs," at another position. In most instances, the presence of heteroplasmy makes data interpretation more complex, but does not render the data nonfunctional.[13]

In *State v. Pappas,* the Supreme Court of Connecticut rejected the defendant's argument that, given testimony regarding heteroplasmy, the trial court should not have admit-

---

mtDNA sequence) for each of these copies is unlikely because of the immense amounts of mtDNA present in the body. Thus, heteroplasmy (the occurrence of more than one mtDNA type at a particular position or region in a DNA sequence) is expected to be present at some level in all individuals, though not always detectable with current instrumentation. "[I]t is now commonly accepted that heteroplasmy is present to some degree in all individuals; most individuals possess very low levels of heteroplasmic variants undetectable by DNA sequence analysis. [D]etectable levels (minor component greater than 10 to 20%) of heteroplasmy have been observed in approximately 5% of the individuals analyzed." Charles A. Linch, B.S., Davis A. Whiting, M.D. & Mitchell M. Holland, Ph.D., *Human Hair Histogenesis for the Mitochondrial DNA Forensic Scientist,* 46 Journal Forensic Science 844, 850 (July 2001).

**13.** *See* Alice R. Isenberg, *The FBI Law Enforcement Bulletin: Forensic mitochondrial DNA analysis: A different crime-solving tool,* p. 3–4, August 2002. For more information on heteroplasmy, see M.M. Holland & T.J. Parsons, *Mitochondrial DNA Sequence Analysis—Validation and Use for Forensic Casework,* 11 Forensic Science Review 22, 23–25 (1999) ("Heteroplasmy has the potential to both complicate and strengthen forensic identify testing, and must be taken into account.").

ted the mtDNA analysis presented at his trial. 776 A.2d at 1109. The *Pappas* Court noted that (1) no evidence of heteroplasmy in either the known or questioned samples had been presented at trial,[14] and (2) even if it had been present, heteroplasmy would result in false exclusions, not false inclusions. For these reasons, the *Pappas* Court held that questions about heteroplasmy may bear on the weight of mtDNA evidence, but they do not render it inadmissible. *Id.*[15] We agree with that holding.

More important, Dr. Stewart testified that there was no evidence of heteroplasmy in this case, meaning that appellant's known mtDNA sequence shared a common base at every position with the mtDNA sequence found in the hair, and had the same pattern at every position. Dr. Stewart also disagreed that heteroplasmy rendered mtDNA testing unreliable, stating that the published literature on the subject "does not support that."

During the pretrial hearings, Dr. Bruce Budowle, senior scientist in the FBI's biological laboratory division and an expert in mtDNA analysis, also testified regarding heteroplasmy. According to Dr. Budowle, heteroplasmy exists in "the rarest of the circumstances. And, again the rarest of the circumstances, we're willing to accept there possibly could be false exclusion."

Judge Wright found that the existence of heteroplasmy in some mtDNA did not render the evidence generally unreliable:

---

**14.** The defendant's known mtDNA sequence not only shared a common base at every position with the questioned sample, but also had exactly the same pattern at every position as that sample. *Pappas,* 776 A.2d at 1109.

**15.** *See also People v. Klinger,* 185 Misc.2d 574, 713 N.Y.S.2d 823, 831 (N.Y.Co.Ct.2000) ("The existence of contamination and heteroplasmy does not affect the reliability of the scientific procedure and these issues, which are subject to cross-examination at the time of trial, do not invalidate the procedures of mtDNA testing.").

The court, also, would find that the specific procedures that were used by the FBI laboratory to extract, amplify, and sequence, and consequently analyze the particular hairs in this case to identify characteristics of another's genetic material was certainly reliable. . . . So the question is, . . . is the testing procedure generally reliable? And I say, "Yes," because it is accepted . . . in the scientific community. And was the testing procedure that's used in this case reliable? And I would say, "Yes." The existence of contamination, the existence of heteroplasmy does not affect the reliability of the scientific procedure generally, nor the procedure used in this particular case by the FBI laboratory, Dr. Stewart, and those under him.

We agree with that conclusion.

### Appellant's "Chain of Custody" Argument

Appellant argues that, even if the mtDNA was admissible under a *Frye–Reed* standard, the circuit court should have excluded it due to gaps in the chain of custody of the glove. The law requires a party to establish a "chain of custody" when offering certain items of evidence, in order to assure that the particular item is in substantially the same condition as it was when it was seized. *Lester v. State,* 82 Md.App. 391, 394, 571 A.2d 897 (1990). Establishing a "chain of custody" as to a certain item provides a means to "account for its handling from the time it was seized until it is offered in evidence." *Id.* "The circumstances surrounding its safekeeping in that condition in the interim need only be proven as a reasonable probability . . . and in most instances is established . . . by responsible parties who can negate a possibility of 'tampering' . . . and thus preclude a likelihood that the thing's condition was changed." *Best v. State,* 79 Md.App. 241, 250, 556 A.2d 701, *cert. denied,* 317 Md. 70, 562 A.2d 718 (1989) (citations omitted).

During the hearing, the State established the following chain of custody for the glove. The glove was found by Phyllis Carpenter on February 15, 1994. She placed it on her porch, where it was when she called the police the next

morning. Detective Rourke recovered the glove from Ms. Carpenter's porch at 9:00 a.m. on the morning of February 16, 1994. At 11:30 a.m., Jeffrey Kercheval, the crime scene technician, photographed the glove and logged it into evidence. On February 18, 1994, Detective George Brandt delivered the glove, along with other evidence, to the evidence room at the FBI crime lab in Washington, D.C. On February 22, 1994, Melissa Smrz, a forensic scientist, inventoried the tape-sealed box and designated the glove as "Q2."

On February 23, 1994, forensic scientist Janet Bray received the glove from Smrz and conducted the hair and fiber examination. At this point, Bray found the hair on the glove and, using polymer, sealed the hair onto a slide. Bray returned the glove and the slide to Smrz, who mailed the evidence back to the Hagerstown Police Department on March 21, 1994. Kercheval opened the sealed FBI box on March 30, 1994, and placed the contents back into evidence. The next day Lieutenant Robert Voytko logged out the glove and returned it on June 7, 1994.

On June 12, 1998, the glove was received in the FBI's DNA testing department and given to Dr. Stewart, who broke the seal of the slide to test the hair. The glove was sent to the Baltimore FBI office on September 8, 1998, where it was placed in storage the next day. On May 23, 2000, Detective Shank signed it out and delivered it back to the Hagerstown Police Department. Jeffrey Kercheval logged the glove into evidence on June 6, 2000. On June 21, 2000, Kercheval shipped the glove to Bode Technology, via Federal Express, where it was received by Keith McElfresh, and examined on August 10, 2002, by Suzanna Ulery. Ulery sent the glove back to the Hagerstown Police Department on February 27, 2001, where Kercheval signed it back into evidence on March 6, 2001. It remained there until trial.

Judge Wright found that "there was reasonable probability that the [ ] hair was in substantially the same condition when it was scientifically tested as it was when it was discovered by

the law enforcement agency." That finding was not clearly erroneous. The evidence was properly admitted at trial.

## II

▮▮▮ Appellant argues that Judge Wright erred during the trial when, in response to a question from the jury, he engaged in a discussion with counsel that was overheard by the jury. The record shows that the following transpired:

[THE COURT]: Now before we do adjourn, I want to bring something to the attention of defense counsel. There has been a request by individual jurors to look at evidence that has been admitted. I mean we have I don't know how many exhibits that are now here sixty-something probably or fifty-something.

They've had the opportunity to personally observe every witness who's testified under oath, made their own mental and physical notes of witnesses but they ... and they've had the opportunity to look at a couple of the exhibits that have been received. But the more extensive ones they have not.

Now I would not want the jury or any jurors to discuss the case or discuss any particular evidence until they have received it all in their deliberations. And I don't want there to be anything done by a juror outside of the jury room ... or outside of the courtroom that would not be approved really by defense counsel.

So the request is to observe or to look at individual pieces of evidence. Now what we can do is have the evidence or the individual pieces ... exhibits, whatever a juror wants to look at, having said, "I would like to look at Exhibit Number 7," for example. We could have that available for the juror to look at the beginning of the day before we come into court at nine o'clock, come in early. Could take that to the jury room and look at and make one's own notes again as he or she would be observing the ... a witness so long again as there is no discussion about the information received between....

But I don't want to do that without the concurrence of counsel.

[DEFENSE COUNSEL]: I don't want ... I don't want to appear to be the bad guy and say no. But, your Honor, I think that ... I have to say I can't ... I don't think that we should do that until at the conclusion of the case when everything is given over.

[THE COURT]: I've allowed it when we've had multiple day civil cases. But I've not done it in multiple day criminal cases.

[DEFENSE COUNSEL]: And just for some clarification, [there are] several reasons why I feel that way and I'll name some of them. A couple of them is [sic] there are lots of exhibits; not all of them are entered into [evidence] even though we identify them and we've talked about them. So not all of them are entered. Furthermore, a lot of them are not going to be entered in and I certainly would not want one of those to go back.

[THE COURT]: Well I think ... I understand, you know, and I understand also the risk that could occur and could be avoided actually by not ... not allowing a juror ... individual to further observe. So I'm not going to do it without ... without concurrence and I understand and I think the jury can understand your reluctance or anybody's reluctance.

[DEFENSE COUNSEL]: Your Honor, there's one other issue that occurs to me. Some of these items in evidence perhaps it's not wise to be handling them without ... some of them are bio-hazards. I mean ... I just raise it because....

[THE COURT]: We won't do it. We won't ... the jury will have it all in the jury room at the end of the case.

The argument that error occurred because the jurors overheard this conversation has not been preserved for our review. The record shows that, on the next morning, the following transpired out of the presence of the jury:

[DEFENSE COUNSEL]: Your Honor, I have an issue that I'd like to raise with your Honor. Last night ... before you went off the bench, you informed us the members or someone from the jury had approached you and asked about being able to take some of the exhibits back and look at those during the course of the trial.

We don't ... know what the nature of that communication was, whether it was somebody from the jury approached you, whether it was a note that was passed to you or somebody passed on. That's the first thing.

The second thing is that the defense really felt uncomfortable in front of the jury responding to a question from the jury. And what we would like to do is ask your Honor if there is communications that we be informed of those outside of the jury and any decisions that we have to make we can make then.

[THE COURT]: Certainly, I thought I was more than fair in bringing it up and raising it in open court ... with you. [O]ne juror in going ... back into the jury room after recess just passed me and said, "Could I look at one of the exhibits?" I said, "No."

So I came out here and said that a juror asked if they could look at an exhibit and brought it up in open court with you, nothing secret or ... or sinister about that. But I surely will again as I did then I thought share with you any communication that any juror has with me at all and I thought that's what I was doing when I brought it up with you, is sharing that I had gotten this communication that a person, a juror wanted to look at one of the exhibits and read one of the exhibits.

[DEFENSE COUNSEL]: Please don't misunderstand. I know you did and that's why I said that was the first we have. I'm not saying you're ... you did tell us. I just ... I just felt like I was on the spot in front of the jury.

[THE COURT]: Well okay, I didn't want to do that and just if you felt that way I apologize because I obviously ... but I don't think the jury responded by feeling that you

were trying to hide something or do anything untoward either. I mean they accepted it. In fact, the juror, I looked over at the juror and he said okay. One of those kind of things.

And when we finish because I think you should again know every conversation or any kind of communication, at the end of the day, I did when I went back and the jury went back and I said, "Now you will get all of the evidence that has been submitted for you at the time of your deliberation." I said, "The attorneys will be pointing out to you in closing arguments certain exhibits that they feel should be given more weight than others and everything will be back in the jury room with you and you will observe it then together." That's what I said.

[B]ut certainly in the future if any type of communication [occurs] I ... certainly will bring that to your attention outside of the jury. And if we have any need of any more discussion about this, we'll do it outside the jury. Absolutely.

[DEFENSE COUNSEL]: Thank you, your Honor.

[THE COURT]: You now, I do apologize for a method that might have put you ill at ease. I did not intend to do that at all.

[DEFENSE COUNSEL]: I understand.

While it is true that defense counsel expressed concern about the fact that the jurors overheard the conversation, this concern was not (1) expressed until the following day, or (2) accompanied by a request for a curative instruction. Under these circumstances, we shall not award a new trial on the ground that the trial judge failed to take action that the trial judge was never requested to take.[16]

---

16. Ordinarily, we will not decide an issue unless it "plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal." Md. Rule 8–131(a).

■ Moreover, even if this issue had been properly pre-served, we would not disturb the verdict because we are persuaded that there is no merit in the argument that the "spirit" of Md. Rule 4–326 was violated when his trial counsel were denied the "opportunity for input in designing an appropriate response to each question" before the response was given to the jury.[17] Appellant claims that although he was given this opportunity, he was forced to respond in front of the jury, and that this was unfair and may have created doubt in the minds of the jurors as to the defense's integrity.[18]

■ Maryland Rule 4–326(c) provides:

**Communications with jury.** The court shall notify the defendant and the State's Attorney of the receipt of any communication from the jury pertaining to the action before responding to the communication. All such communications between the court and the jury shall be on the record in open court or shall be in writing and filed in the action.

Rule 4–326(c) requires full communication of the contents of a jury communication so that both parties can have input into the response. *Smith v. State,* 66 Md.App. 603, 623–24, 505 A.2d 564 (1986); *Allen v. State,* 77 Md.App. 537, 545, 551 A.2d 156 (1989). "[T]he spirit of the Rule is to provide relevant information to those most vitally concerned with the trial. . . ." *Graham v. State,* 325 Md. 398, 415, 601 A.2d 131 (1992).

■ We disagree with the argument that a trial court must make sure that the jury does not hear *any* discussion with counsel and the defendant about *any* communication the court has received from the jury. While we do advise caution when the trial court decides to discuss anything with counsel in the presence of the jury, the case at bar does not involve a situation in which the trial court (1) failed to reveal the entire

---

17. Md. Rule 4–326(c) and Md. Rule 2–521(d).

18. We are persuaded that defense counsel was not "forced" to object in front of the jury, as a bench conference could certainly have been requested.

contents of a jury note,[19] or (2) engaged in an *ex parte* communication with a member of the jury.[20] Moreover, a violation of Rule 4–326(c) does not require reversal if the issue was not preserved for appeal or the error was harmless. *Graham*, 325 Md. at 415, 601 A.2d 131. There is no evidence that the communication or the discussion influenced the verdict or unfairly prejudiced appellant in any way. Appellant's counsel had every opportunity to request that Judge Wright advise the jury that he, not defense counsel, decided that the evidence would be made available only at the conclusion of the trial.

### III

Appellant argues that the evidence was insufficient to sustain his murder convictions. According to appellant, (1) the evidence was insufficient to establish that he participated in the murders in any way, and (2) the State failed to prove the underlying felony of burglary.[21] There is no merit in either of these arguments.

 The standard for our review of the sufficiency of the evidence is "whether after viewing the evidence in the light most favorable to the prosecution *any* rational trier of fact could have found the essential elements of the crime

---

**19.** In *Allen*, this Court granted a new trial to the appellant, who had agreed to accept a majority verdict upon learning that the jurors could not reach a unanimous agreement, but who had not been told that the jurors had advised the trial judge that they were "hung, 11 to 1 for conviction." *Allen, supra*, 77 Md.App. at 545, 551 A.2d 156.

**20.** In *Stewart v. State*, 334 Md. 213, 228–30, 638 A.2d 754 (1994), the Court of Appeals granted a new trial because the trial judge did not tell the prosecutor or defense counsel in a timely fashion that he had engaged in an *ex parte* communication with an emotionally distressed juror during jury deliberations.

**21.** Although we shall vacate appellant's sentences for the felony murder convictions, we do so only because upholding two first degree murder convictions for the killing of the same victim(s) is redundant. *Burroughs v. State*, 88 Md.App. 229, 247, 594 A.2d 625 (1991). We are persuaded, however, that there was sufficient evidence for the jury to convict appellant of first degree murder on both theories.

beyond a reasonable doubt." *Holland v. State*, 154 Md.App. 351, 365, 839 A.2d 806 (2003) (citing *Jackson v. Virginia*, 443 U.S. 307, 313, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).[22]

## Felony Murder and Burglary

A conviction of felony murder requires the State to prove (1) the elements of a qualified, underlying felony, and (2) that death occurred in the perpetration of that felony. A felony murder conviction can be based upon proof that a burglary occurred, and that a death occurred during the commission of the burglary.

Prior to deliberations, the jury received the following instructions:

> Now what is first degree felony murder? The defendant is also charged with the crime of first degree murder, felony in nature. In order to convict the defendant of first degree

---

22. This standard applies to all criminal cases, including those resting upon circumstantial evidence, *Wiggins v. State*, 324 Md. 551, 567, 597 A.2d 1359 (1991), *cert. denied*, 503 U.S. 1007, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992), since, generally, "proof of guilt based in whole or in part on circumstantial evidence is no different from proof of guilt based on direct eyewitness accounts." *Eiland v. State*, 92 Md.App. 56, 67, 607 A.2d 42 (1992), *rev'd on other grounds sub nom.*, *Tyler v. State*, 330 Md. 261, 623 A.2d 648 (1993). "[C]onviction upon circumstantial evidence alone is not to be sustained unless the circumstances are inconsistent with any reasonable hypothesis of innocence." *West v. State*, 312 Md. 197, 211–12, 539 A.2d 231 (1988). Circumstantial evidence is, however, entirely sufficient to support a conviction, provided the circumstances support rational inferences from which the trier of fact could be convinced beyond a reasonable doubt of the guilt of the accused. *Finke v. State*, 56 Md.App. 450, 468–78, 468 A.2d 353 (1983), *cert. denied*, 299 Md. 425, 474 A.2d 218, and *cert. denied*, 469 U.S. 1043, 105 S.Ct. 529, 83 L.Ed.2d 416 (1984).

Weighing the credibility of witnesses and resolving any conflicts in the evidence are tasks proper for the fact finder. *See Binnie v. State*, 321 Md. 572, 580[, 583 A.2d 1037] (1991); *McKinney v. State*, 82 Md.App. 111, 117[, 570 A.2d 360], *cert. denied*, 320 Md. 222[, 577 A.2d 50] (1990). In performing this role, the jury has discretion to decide which evidence to credit and which to reject. *See Velez v. State*, 106 Md.App. 194, 202[, 664 A.2d 387] (1995), *cert. denied*, 341 Md. 173[, 669 A.2d 1361] (1996). "[I]t is the exclusive function of the jury to draw reasonable inferences from proven facts." *McMillian v. State*, 325 Md. 272, 290[, 600 A.2d 430] (1992).

felony murder the State must prove beyond a reasonable doubt that he or another participating in the crime with him committed or attempted to commit a burglary. And the defendant or another participating in the crime killed Daniel Davis and/or Wilda Davis and that the act resulting in the death of Daniel Davis and Wilda Davis occurred during the commission of or the attempted commission of the burglary.

\* \* \*

The defendant is charged with the crime of burglary.[23] Burglary is the breaking and entering of someone else's dwelling house at night with the intent to commit a felony therein. In order to convict the defendant of burglary the State must prove beyond a reasonable doubt that there was a breaking and an entry, that the breaking and entry was into someone else's dwelling house, that it occurred at night and that it was done with the intent to commit larceny and/or murder therein.

And that the defendant was the person who committed the burglary. Breaking means the creation of an opening, such as breaking or opening a window or pushing open a door. Breaking does include gaining entry by fraud, tricks, force or by conspiracy with one within the dwelling. Entering through an open door or with permission is not breaking. Entry occurs if any part of the defendant's body is within a house. A dwelling house is a structure where people regularly sleep. Night is that time between sunset and sunrise when there's not enough daylight to see a person's face.

Now the defendant, of course, is charged with the crimes of first degree, premeditated murder, felony murder and burglary. A person who aids and abets in the commission of a crime is as guilty as the actual perpetrator even though

---

**23.** The court explained to the jury the elements of common law burglary, which was the law in effect at the time of the murders, before the codification of burglary. Effective October 1, 1994, the Legislature enacted Md.Code, Art. 27, § 29, which eliminated the nighttime requirement.

he did not personally commit each of the acts that constitute the crime.

A person aids and abets the commission of a crime by knowingly associating with the criminal venture with the intent to help commit the crime, being present when the crime is committed and seeking by some act to make the crime succeed. In order to prove the defendant aided and abetted the commission of a crime the State must prove beyond a reasonable doubt that the defendant was present when the crime was committed, that the defendant wilfully participated with the intent to make the crime succeed.

Presence means being at the scene or close enough to render assistance to the other perpetrators. Willful participation means voluntary and intentional participation in the criminal act. Some conduct by the defendant in furtherance of the crime is necessary. The mere presence of the defendant at the time and place of the commission of a crime is not enough to prove that he aided and abetted. But if presence is proven, it is a fact that may be considered along with all of the surrounding circumstances.

However, presence at the scene of a crime can be sufficient if it was intended to and does aid the primary actor, for example. And I think the most illuminating example is by a lookout to warn the primary actor of danger.

 On the basis of the evidence presented, the State was entitled to each of those instructions. At the time when the victims were murdered, burglary was defined as the breaking and entering of a dwelling house in the nighttime with the intent to steal the personal goods of another. *Warfield v. State*, 315 Md. 474, 493, 554 A.2d 1238 (1989) (citing Md.Code, Art. 27, §§ 30(a)). A breaking may occur by merely opening a closed, unlocked door.[24] *Robinson v. State*, 67 Md.App. 445, 458, 508 A.2d 159, *cert. denied*, 307 Md. 261, 513 A.2d 314 (1986). "The breaking of a dwelling house or other

---

**24.** There was no evidence of an actual breaking in this case. There were no signs of forced entry and no evidence that appellant or any of the other suspects used any type of physical force to enter the home.

structure ... may be actual, as where physical force is applied, or constructive, as where entry is gained through fraud or trickery." *Finke v. State*, 56 Md.App. 450, 467, 468 A.2d 353 (1983).

Although there was no evidence of an actual breaking in the case at bar, the jury could rationally infer from the facts and circumstances presented that a constructive breaking occurred when the murderers gained entry by false pretense. *Reed v. State*, 316 Md. 521, 524, 560 A.2d 1104 (1989). Karen Minnich testified that, before the murders, appellant told her that he had been asked to rob some elderly people. Dawn Albright testified that, after the murders, appellant told her that he had been upstairs in the Davises' home looking for money. Robert Keedy testified that appellant told him that he ransacked the Davis house that night. In addition, there was physical evidence, i.e., appellant's hair on the bloody glove and a witness seeing him with the knife prior to the murders, which put him in the house that night. The jury could certainly infer that appellant was in the house that night.

In *Holland v. State*, 154 Md.App. 351, 839 A.2d 806 (2003), the owner of the house entered by Holland testified that (1) Holland was silent as he knocked on the door, and (2) in response to Holland's knock, the owner answered, "come in." This Court held that there was insufficient evidence to support a conviction of burglary based on a theory of a constructive breaking.

In *Oken v. State*, 327 Md. 628, 662–63, 612 A.2d 258 (1992), *cert. denied*, 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993), the Court of Appeals held that the State's evidence was insufficient to establish a breaking. Although the State presented evidence that Oken had tried to trick other people in the victim's neighborhood to gain entry to their homes, the record was completely devoid of any evidence showing a constructive breaking of the victim's apartment.

In the case at bar, however, Mrs. Davis told Virginia that someone was at the door. Virginia could hear people talking for about two minutes. She also heard her father say that he

knew·what the person at the door wanted, that he "wanted gas." That evidence was sufficient to support a finding that appellant, or someone acting in concert with him, defrauded Mr. Davis in order to gain entry to the victims' home.

The jury was permitted to draw a rational inference that the murderers schemed their way into the victims' home. While many witnesses testified that the victims kept the rent money they received in the house, no paper currency was found after the murders. Again, the question is "whether the verdict was supported by sufficient evidence that, directly or circumstantially, supports a rational inference of facts that could convince a trier of fact of the defendant's guilt beyond a reasonable doubt." *Holland,* 154 Md.App. at 365, 839 A.2d 806 (citation omitted). This evidence "possibly could have persuaded" the jury, and that is all that is required. *Fraidin v. State,* 85 Md.App. 231, 241, 583 A.2d 1065, *cert. denied,* 322 Md. 614, 589 A.2d 57 (1991).

The medical examiner testified that the victims were stabbed multiple times and died sometime that night. In addition, there was ample evidence that appellant broke into the house and stole money. That is all that is necessary for the jurors to find appellant guilty of felony murder.

### Premeditated Murder

 A person may be convicted of first degree premeditated murder upon evidence legally sufficient to establish that the person perpetrated a wilful, deliberate, and premeditated killing.

> "For a killing to be 'wilful' there must be a specific purpose and intent to kill; to be 'deliberate' there must be a full and conscious knowledge of the purpose to kill; and to be 'premeditated' the design to kill must have preceded the killing by an appreciable length of time, that is, time enough to· be deliberate. It is unnecessary that the deliberation or premeditation shall have existed for any particular length of time."

*State v. Raines,* 326 Md. 582, 589, 606 A.2d 265 (1992) (quoting *Tichnell v. State,* 287 Md. 695, 717–18, 415 A.2d 830 (1980)). If the killing results from a choice made as a consequence of thought, no matter how short the period between the intention and the act, the crime is characterized as deliberate and premeditated. *Id.* (citing *Tichnell,* 287 Md. at 718, 415 A.2d 830).

In the case at bar, the physical evidence placed appellant at the crime scene. Testimonial evidence provided him with a motive. There was testimony that (1) before the crime, appellant had been asked to rob some elderly people, and (2) after the murders, he admitted to having done so. With respect to motive, the jury was presented with enough evidence to infer that appellant had a motive to rob and kill the victims so he would be compensated by those who would benefit from their deaths.

Appellant was seen with the murder weapon, the knife, prior to the murders. The glove found at the crime scene, which contained the blood of one of the victims, also contained a hair that matched appellant's mtDNA profile. There was also evidence that (1) the exact same type of glove was bought at a store down the street two hours before the murders, and (2) a friend of appellant's drove him to that store to get gloves at that time. The jury could find that appellant was no mere bystander to this crime.

As for premeditation, the method used to kill the victims establishes premeditation. Both victims were bound. Mr. Davis was stabbed nine times in the chest and six times in the back, several times piercing his heart, several times to a depth of seven inches with a six inch knife. Mrs. Davis was stabbed five times in the chest and four times in the back. This evidence was more than sufficient to convict appellant of first degree premeditated murder.

## IV

Appellant was sentenced to three consecutive life terms, two for the first degree premeditated murders and one

for the felony murder of Wilda Davis. The State concedes that the trial court erred in imposing a life sentence for both the first degree felony murder and the first degree premeditated murder of Wilda Davis. We agree.

> [I]f one wilfully, with deliberation and premeditation, kills a person in the course of an armed robbery, [the killer] cannot receive both a sentence for deliberate and premeditated murder ..., and a separate sentence for felony murder.

*Williams v. State*, 323 Md. 312, 325, 593 A.2d 671 (1991). We must therefore vacate the sentences imposed on both felony murder convictions. We shall not, however, vacate the sentence imposed on the burglary conviction.

**SENTENCES IMPOSED FOR FELONY MURDER CONVICTIONS VACATED; JUDGMENTS OTHERWISE AFFIRMED. APPELLANT TO PAY 70% OF THE COSTS; 30% OF THE COSTS TO BE PAID BY WASHINGTON COUNTY.**